1                    UNITED STATES DISTRICT COURT

2                  NORTHERN DISTRICT OF MISSISSIPPI

3
   UNITED STATES OF AMERICA,        )
4                                   )
            Plaintiff,              )         CAUSE NO. 3:20CR039
5                                   )
            VS.                     )
6                                   )
   XAVERIANA COOK,                  )
7                                   )
            Defendant.              )
8  _____)

9

10       SENTENCING AS TO COUNTS 1 AND 4 OF THE INDICTMENT
     BEFORE UNITED STATES SENIOR DISTRICT JUDGE NEAL B. BIGGERS
11            MONDAY, FEBRUARY 7, 2022; 1:35 P.M.
                    OXFORD, MISSISSIPPI
12
   FOR THE GOVERNMENT:
13
          United States Attorney's Office
14        CLAY DABBS, ESQ.
          CLYDE MCGEE, ESQ.
15        900 Jefferson Avenue
          Oxford, Mississippi 38655-3608
16

17 FOR THE DEFENDANT:

18        Federal Public Defender's Office
          GREGORY SCOTT PARK, ESQ.
19        1200 Jefferson Avenue, Suite 100
          Oxford, Mississippi 38655
20

21
   Proceedings recorded by official stenographic court reporter.
22 Transcript produced with computer-aided transcription.

23
                 RITA DAVIS, FCRR, RPR, CSR #1626
24             FEDERAL OFFICIAL COURT REPORTER
               911 JACKSON AVENUE EAST, SUITE 369
25                OXFORD, MISSISSIPPI  38655

1                    <u>TABLE OF CONTENTS</u>

2
   Style and Appearances......................................1
3  Table of Contents.........................................2

4                         <u>DIRECT</u>      <u>CROSS</u>     <u>REDIRECT</u>
   <u>WITNESSES FOR DEFENDANT</u>
5
   Mark Allen                7            16
6  Xaveriana Cook            22           53
   Alexander Paret, Ph.D.    66           80
7
   Defendant rests...........................................103
8
                         <u>DIRECT</u>      <u>CROSS</u>     <u>REDIRECT</u>
9  <u>WITNESSES FOR GOVERNMENT</u>

10  Justin Niedzwecki          104          110

11 Government rests..........................................122

12
                        <u>EXHIBITS</u>
13
   <u>EXHIBITS</u>           <u>DESCRIPTION</u>                       <u>RECEIVED</u>
14 D-1     Criminal Complaint from the State of      29
           Illinois Circuit Court of the 17th
15         Judicial Circuit
   D-2     Photographs and text messages (13         37
16         pages)
   D-3     Curriculum Vitae of Alexander J. Paret,    80
17         Ph.D.
   D-4     Forensic Neuropsychological Evaluation     80
18         (Sealed Document)
   G-1A    Disc of TikTok Videos                     104
19 G-1B    TikTok Record                             104
   G-2     Facebook Post                             104
20 G-4     Disc of Jail Calls                        104
   G-5     Photographs                               104
21

22 Victim Impact Statement by Sabrina Blankenship..........118

23 Court's Ruling..........................................129

24 Court Adjourned.........................................136

25 Court Reporter's Certificate............................137

```
1          (CALL TO ORDER OF THE COURT)

2              THE COURT:  All right.  We have this matter this

3   afternoon involving the sentencing of Ms. Cook.  Mr. Park, you

4   ready to proceed?

5              MR. PARK:  Yes, Your Honor.

6              THE COURT:  Is the Government ready?

7              MR. MCGEE:  Yes, Your Honor.

8              THE COURT:  All right.  There are a couple of

9   objections to some of the information that's being offered --

10  wants to be offered.  What's the Government's objection to

11  Mr. Park's offers?

12             MR. MCGEE:  Your Honor, the Government does not have

13  any objections to the PSR; but we do dispute Mr. Park's

14  objections and are prepared to call a witness in response.

15             THE COURT:  Well, what objection to what evidence are

16  you talking about?

17             MR. MCGEE:  Your Honor, specifically, the Bill

18  Carlstrom notes and then, also, the mitigation or minor role

19  adjustment.  We're also respectfully arguing that that should

20  not apply.

21             THE COURT:  Now, Mr. Park, I've read the Presentence

22  Report.  I've read the memoranda that have been presented, one

23  involving the testimony of a psychologist.  The issue seems to

24  be, between you gentlemen, whether this defendant was a victim

25  of a battered woman syndrome or something of that nature.
```

1    I read Dr. Paret's report, which is about 40 pages of

2    single-spaced typing paper; and I don't need to hear him go

3    over what I've already spent 2 or 3 hours reading.  What is it

4    that you want to -- what is it you tell me he can add to this

5    report, if anything?

6         MR. PARK:  Your Honor, in speaking with Dr. Paret,

7    it's my understanding that while the report is roughly

8    39 pages, as Your Honor alluded to, there are still details

9    that he can provide based on his evaluation of Ms. Cook that

10   would go directly to a submission of duress for sentencing

11   purposes.  He's being offered in mitigation of sentencing.  He

12   can explain both the -- and I don't see a need to go through

13   all of the testing necessarily, but I -- I would --

14        THE COURT:  Well, I don't -- no.  You won't.  I

15   guarantee you that.

16        MR. PARK:  Well, I intend to share his observations

17   and conclusions without going through all the tests themselves,

18   without regurgitating that.

19        THE COURT:  How much time do you think you need to

20   talk to him?

21        MR. PARK:  My guess would be approximately

22   30 minutes.  It depends.  Part of it would depend on qualifying

23   him as an expert first.  If there's a dispute to that, then I

24   would certainly have to go into his qualifications.

25        THE COURT:  I've read his background, and I'm going

1  to accept him as qualified to give an opinion on this.

2          MR. PARK:  Yes, sir.

3          THE COURT:  So the objection of the Government to

4  that effect is overruled.  So that will knock out some.  I'll

5  give you 20 minutes to talk to him.  You don't need to take

6  that much.

7          MR. PARK:  Yes, sir.

8          THE COURT:  This is all supplemental to the, as I

9  said, 39, 40 pages of the single-spaced, typed report; that

10  I've already read that you've presented.  Of course, the

11  Government will have time to cross-examine him if you wish to

12  do so.

13      Mr. Dabbs, you want to do that, I assume?

14          MR. MCGEE:  Yes, Your Honor.

15          THE COURT:  Okay.

16      All right.  That takes care of one objection.  What else

17  do we have?  Anything else that there's an objection to?

18          MR. PARK:  Your Honor, we filed objections to the

19  factual averments in the Presentence Report relating to an

20  individual.  And I tried to explain the basis for those

21  objections when I filed the objections to the Presentence

22  Report.  And then, also, we objected to Ms. Cook not being

23  credited for her minor role in the overall scheme of things.

24          THE COURT:  Well, I'll let you argue that.

25          MR. PARK:  Thank you.

1        MR. MCGEE:  Your Honor, in response to those

2  objections, we have a few things -- a few short clips of calls

3  and short clips of videos that were a couple of jail calls that

4  are just snippets and then a couple of videos found in her

5  phone that we believe will go directly to that objection of a

6  minor role.

7        THE COURT:  Okay.

8        MR. MCGEE:  And we can do it through Mr. Niedzwecki

9  in a short time, Your Honor.

10       THE COURT:  All right.

11    Okay.  What do you want to do first, Mr. Park?

12       MR. PARK:  Your Honor, just whatever's acceptable

13  with the Court.  I will call Ms. Cook's grandfather as a

14  witness and then call Ms. Cook and then Dr. Paret.  And we can

15  proceed however Your Honor would like.

16       THE COURT:  Okay.  We'll go in that order.

17       MR. PARK:  Okay.  Then, Your Honor, we'd call Mark

18  Allen to the stand, please.

19       THE COURT:  Now, we're going to limit the time on

20  these witnesses.  Would 10 minutes be enough for this witness,

21  Mr. Park?

22    (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

23       THE COURTROOM DEPUTY:  Please take a seat.  And state

24  and spell your first and last name for the record, please.

25       THE WITNESS:  My name is Mark Allen, and my last name

1    is A-l-l-e-n.

2              THE COURT:  Okay.  Go ahead.

3              MR. PARK:  Thank you, Your Honor.

4              MARK ALLEN, DEFENDANT'S WITNESS, SWORN

5                    DIRECT EXAMINATION

6  BY MR. PARK:

7  Q.    Mr. Allen, how are you related to Xaveriana Cook?

8  A.    I'm her grandpa.

9  Q.    And have you actively been involved in raising her?

10 A.    Off and on, yes.  Probably most of the time.

11 Q.    Did she live with you and your wife?

12 A.    For a while, yes.

13 Q.    How long is a while?

14 A.    Most of her life.  I'd say probably three-quarters of her

15 life.

16 Q.    Okay.  Did she have any history of abuse or trauma growing

17 up?

18 A.    Yes.  When her mom would -- got remarried and her husband

19 was -- well, he wasn't real nice to her.  He -- he did all

20 kinds of goofy things to her.  He'd yell at her all the time.

21 There was four kids, and two were his; and her and her sister

22 weren't his.  And he would baby all the kids but her.

23        And he would make her do most of the cleaning in the house

24 and clean up after the other ones.  He'd -- if she didn't do

25 what he thought she should do, he'd make her stand in a corner

1  and make sure her nose touched the wall and stuff like that.

2  Q.    Was there physical abuse?

3  A.    I never witnessed any physical abuse.

4  Q.    Okay.  And that was her stepfather who was taking those

5  actions?

6  A.    Yes.

7  Q.    Okay.  I turn your attention to her involvement with

8  Hunter Carlstrom.  And, first of all, she was in a prior

9  relationship and has a child from that relationship, right?

10 A.    Yes.

11 Q.    And she's currently involved with that same individual?

12 A.    Yes.

13 Q.    What's his name?

14 A.    Brent Hultgren.

15 Q.    Okay.  But there was a time when she separated from him,

16 and she developed a romantic relationship with Hunter

17 Carlstrom?

18 A.    Yeah.  In that situation, her and Brent were doing real

19 good.  They had had a little boy, and they were doing real

20 good.  He had a good job.  And then his grandma died.  And

21 then, not too long after that -- I think it was that same

22 year -- I could be wrong on it -- his mom passed away.

23       He broke his ankle, lost his job.  They couldn't do a lot

24 of the stuff they could before, so their living expenses were

25 getting tight; and it was causing friction.

ALLEN - DIRECT                                                    9

 1        And her girlfriend, who was Hunter Carlstrom's sister --

 2   she would go visit her, and Hunter Carlstrom was there.  And it

 3   was one of these cases where he said, well, if you were mine,

 4   I'd do this; and I wouldn't do that; and we'd do this.

 5        And, you know, she -- she started thinking that maybe the

 6   grass was a little greener.  And he was treating her the way

 7   she was used to getting from Brent and -- but wasn't, you know,

 8   because of all the friction and stuff that was going on from

 9   what was going on in their lives.  Hunter Carlstrom was trying

10   to be -- what he was trying to do was woo her, you know.

11        And, then, after she found out what he was like, then she

12   kept trying to go back to Brent.  And Brent would let her in,

13   and then Hunter Carlstrom would come over there and threaten

14   Brent.  And, at one point, he was standing outside of the house

15   with a baseball bat and was threatening to kill him and their

16   little boy.

17        And he was just -- he -- he -- what she had done -- it was

18   a Dr. Jekyll/Mr. Hyde deal.  She seen him go from the nice guy

19   when he was treating her to win her over to what he really was.

20   Q.   And what was he really?

21   A.   He was an animal, a monster.

22   Q.   Okay.  And did you personally see examples of this?

23   A.   I -- one night she called me.  I live out in the country

24   outside of town.  And she called me and said, "Grandpa -- and

25   she was crying.  And she says, "Grandpa, Hunter has taken my

1   car keys and left me in the middle of the road on 11th Street.

2   Well, that's a main road through Rockford.

3        And I said, "Where at on 11th?" And she said by rural --

4   by Railroad Avenue, I guess it was. And, on my way there, I

5   had to go by her mom's house. So I -- I call -- I was waiting

6   for my truck to warm up. I called her mom and told her mom

7   there's something going on with your daughter; I'll be by in a

8   minute to pick you up on my way there.

9        So I went by, her mom jumped in. And, on the way there, I

10  explained to her mom what was going on. We got there, and the

11  back of her Malibu was half in the street on 11th Street and

12  half on Railroad Avenue. The keys were gone, and she had

13  scratches on her arms and her hands. And he had left her with

14  the car sitting there, and she had no keys. He reached over

15  and shut it off.

16       Because I guess what she did was pull over, the way I

17  understood it. I could have understood it wrong. But I

18  understood it as she told him to get out; she was done with

19  him. And, so, he reached over and shut the car off and took

20  the keys.

21       So, when I showed up with her mom, he called her. And I

22  could hear him on the phone telling her, if your mom and your

23  grandpa are still there when I get back, I got something for

24  both of them. And then, about that time, her little brother

25  pulled up with his girlfriend. And her and her mom left with

1  them.

2       And my wife pulled up.  I told my wife what was going on.

3  My wife told me to get out of there.  And I said, "Okay.  I'll

4  leave."  My wife left.  And then I took my pickup and went down

5  the street a little ways because it was nighttime.  And I

6  parked in the darkness waiting for him to come.  And he never

7  showed up.  I sat there for over an hour.  He never showed up.

8  Q.   Okay.  Were there other instances of abuse by Hunter

9  Carlstrom?

10  A.   Yes.  My wife and I were coming down Sixth Street, which

11  is a one-way street, two-lane, one-way street; and we were

12  probably 15, 20 blocks from where she was at.  And she was

13  trying to leave.  Hunter was trying to take the tires off her

14  car.  And then he got her down on the ground and choked her and

15  strangled her.

16       And the guy across the street was watching it.  He had

17  sent his son across the street because he's -- he's not that

18  well.  So he sent his son over there and told him to knock it

19  off and get off of her.

20       And, on the way there, again, I called my daughter and

21  told her that we'd be by, because she was on the way there.

22  And my daughter was out at the road, and we picked her up.

23  And, as she was getting in the car and we were taking off, two

24  Rockford squad cars went by.

25       They pulled up there right before us, and we all got out.

1  The neighbor was there.  And the lug nuts were half on her car

2  on the front left tire.  And she had choke marks on her neck

3  and scratches all around her neck.  The police took pictures of

4  it.  That's when they issued a warrant for his arrest.

5  Q.   Was a felony warrant issued for the arrest of Hunter --

6  A.   The way I understood it, yes.

7  Q.   And what happened after -- staying on topic in regard to

8  prior abuse, were there other instances of abuse that you're

9  aware of?

10  A.   I had heard of some, but I never was around for any of

11  them.

12  Q.   Okay.  After James Sartorelli was murdered in Arkansas,

13  Mr. Hunter -- or Hunter Carlstrom and Ms. Cook went on a drive.

14  They went through Memphis and then through Mississippi.  And

15  did you have contact with Ms. Cook during that period?

16  A.   No.

17  Q.   Okay.  Did you attempt to contact her?

18  A.   Yes.

19  Q.   And do you know why you were not able to contact her?

20  A.   I think Hunter was controlling the phone.  And the reason

21  I think that is all of my grandkids -- I got ten grandkids.

22  And they all have a certain way of answering me when I call

23  them or text them.

24     And, when I text her, I didn't get that "grandpa" text

25  back.  Because, usually, she'll start out "grandpa."  Instead,

1  it was how did you find out about this; who told you.  Stuff

2  like that is what I was getting.

3  Q.    Okay.  Did Ms. Cook ever try to leave Mr. Carlstrom?

4  A.    She tried a couple of times.

5  Q.    And what happened?

6  A.    He threatened to kill Mr. Hultgren.  He threatened to kill

7  her son that she had by Mr. Hultgren.  He threatened to do

8  damage to her mom, damage to my wife and me.

9  Q.    Okay.  Now, was Ms. Cook pregnant during this time?

10 A.    Yes.

11 Q.    Did he ever threaten the unborn child?

12 A.    At one point, I was told -- now, this is just hearsay; but

13 I heard that he threatened to cut the baby out of her and --

14          THE COURT:  All right.  Counselor, you've got a

15 certain amount of time; you can use it any way you want.  But

16 your time's running on this hearsay.

17          MR. PARK:  I understand.

18 BY MR. PARK:

19 Q.    Were you aware of any other physical violence between

20 Hunter Carlstrom and Ms. Cook?

21 A.    Just that he liked to be abusive.

22 Q.    And do you know why Ms. Cook did not leave him?

23 A.    She tried to, but she couldn't because every time she did

24 he tried to threaten -- he would threaten the family.

25 Q.    Okay.  Did she take these threats seriously?

ALLEN - DIRECT

1   A.    I think she did.  I think she was scared.

2   Q.    Was he a vindictive fellow?

3   A.    Yes.  My wife and I -- my wife got on the internet and was

4   checking his rap sheet.  And she found out that in Minnesota,

5   by St. Paul, Minnesota, he had knifed a guy and threw him in

6   the ditch and stole his van.

7   Q.    Okay.

8   A.    And then my wife and I started worrying about our

9   granddaughter, and we told our granddaughter about it.  And she

10  asked him about it, and he says that wasn't me.  Well, you went

11  to prison for it.  So, if it wasn't you, why did you go to

12  jail, you know?

13  Q.    How did the abuse affect Ms. Cook?

14  A.    She -- I can't put my finger on it, but she didn't seem

15  the same to me.

16  Q.    Okay.

17  A.    She was -- it was like she was a million miles away.  You

18  know?

19  Q.    Okay.  Has she changed since she's been arrested on this

20  charge?

21  A.    She's been going to a place called "Remedies," which is

22  for people that have had alcohol or battered problems and that.

23  And I think she's learned a lot from this.  She's -- she's

24  starting to get that spark back in her eyes, and she's -- she's

25  starting to be our little girl again.

1  Q.    Okay.  You mentioned alcohol is part of that.  Does

2  Ms. Cook have an alcohol problem?

3  A.    No.  She doesn't.  It's just that that's what they treat.

4  You know?

5  Q.    Okay.  And did you notice any verbal or emotional abuse by

6  Mr. Carlstrom toward Ms. Cook?

7  A.    I would hear him on the phone whenever we were there to

8  help her, saying that he was going to do bodily damage.  Well,

9  he said he was going to do it to me.  And I heard his voice

10 real good on the phone.

11 Q.    Okay.  How has the abuse affected Ms. Cook?

12 A.    I think she's -- at that time, I think she was a little

13 scared of what she did, you know, and how to handle herself.

14 But I think since she's been going to Remedies she's getting

15 over this, and she's -- it's like I said, she's starting to be

16 a pretty decent girl again.

17 Q.    Okay.  Is there anything else you want to add before the

18 Court's sentencing for the Court?

19 A.    I just -- I don't know.  I don't -- I don't feel that --

20 we've got too many kids out there that are parentless.

21         THE COURT:  All right.  Counselor, that -- the

22 Court's not interested in that.

23         MR. PARK:  Okay.  That's all I have.

24         THE COURT:  Cross-examination?

25         MR. MCGEE:  May I proceed, Your Honor?

ALLEN - CROSS

16

1          THE COURT:  Yes.

2                    CROSS-EXAMINATION

3 BY MR. MCGEE:

4 Q.    Mr. Allen, I agree with you.  I do also think that Hunter

5 Carlstrom is a monster.  And he was a monster that your

6 granddaughter was in love with, right?

7 A.    I don't think she was in love with him.  She was mixed up

8 in her mind in what -- there's a difference between love and

9 fondness.

10 Q.    And didn't you state to an investigator for the sheriff's

11 office in Arkansas -- didn't you state that "I think she's in

12 this too far"?  Didn't you say that?

13 A.    I told --

14 Q.    I'm reading a quote.  Is that true?

15 A.    Yeah.  That was Chatham --

16 Q.    Yes.

17 A.    -- was his name?  Yes.

18 Q.    You said --

19 A.    I -- I told him I think that something's happened, that --

20 that she's in this too far, and she can't get out of it.

21 Q.    And you told her to contact the police immediately; did

22 you not?

23 A.    Yeah.  But Hunter Carlstrom was in control of her phone.

24 Q.    Now, come on.

25 A.    I just said that the answers I was getting back from her

ALLEN - CROSS

1  was not her.

2  Q.    Okay.  Well, why don't we pull -- why don't we not take

3  your word for it, and let's look in her phone.  Okay?  Let's

4  look at the evidence that we got from your granddaughter's

5  phone.  Okay?

6        This is directly from a phone extraction.  Okay.  I'm

7  going to show you these.  These are on dates May 8th -- two of

8  them on May 8th, one on May 10th -- excuse me -- two on May

9  10th.  And you understand that May 15th was when that man was

10 shot.  You understand that?  So we got a time line here.  Okay?

11 A.    I didn't get to see those very good, but --

12 Q.    Well, I'm about to show them to you.

13 A.    -- I'm telling you I never talked to her.

14 Q.    Okay.  I'm about to show them to you.  Are you really

15 going to tell this Court that this is not -- that Hunter

16 Carlstrom is in control of her phone?  How does he take that

17 picture?

18 A.    I don't know.

19 Q.    Hearts and prayers?  So you're telling me --

20 A.    I can't answer that.

21 Q.    You're telling me that he photoshopped these and made them

22 look like it was her taking the picture.  What about that?

23 A.    Well, it's quite obvious she didn't take the picture.

24 Q.    Who do you think took it?

25 A.    I don't know, but it wasn't her.

1    Q.    Are you familiar with a selfie?  What about love?  Do you

2    think he doctored that and made that?

3    A.    There's no proving she took the pictures.

4    Q.    Okay.  What about that one with the hearts?

5    A.    There's no proof that she took that.

6    Q.    What about this one?  This is my favorite one.  What about

7    that one?

8    A.    I mean, there's no proof she took pictures; but that does

9    not --

10   Q.    Does that look like an arm extended right there?

11           THE COURT:  All right.  Just a moment.  Just a

12   moment.  The court reporter can only take down one person at a

13   time talking.

14           MR. MCGEE:  My apologies.

15           THE COURT:  Counselor, let him get through with his

16   answer before you ask the next question.

17       And don't you interrupt him when he's trying to question

18   you.  Okay?  You understand that, Mr. Allen?

19           THE WITNESS:  Yes.

20           THE COURT:  All right.

21   BY MR. MCGEE:

22   Q.    Mr. Allen, you've heard of getting a phone -- I don't have

23   one with me.  But you've heard of getting a phone and holding

24   it like this and taking a selfie, correct?

25   A.    Yes.

1  Q.    Okay.

2  A.    I've done it.

3  Q.    And are you telling me that she didn't take this picture?

4  A.    I don't know.  I wasn't there.

5  Q.    Okay.

6  A.    You weren't either.

7  Q.    Okay.  You remember the TikTok videos?

8  A.    Yeah.

9  Q.    Are you telling this Court that you think that Hunter

10  Carlstrom made those TikTok videos?

11  A.    She told me that she had nothing to do with that; he put

12  that on himself.  That she didn't put it on; he did.

13  Q.    What if I told you that she admitted in a jail call, and

14  will probably admit on the stand in a minute, that she made the

15  TikTok videos?

16  A.    I'm going by what she told me.

17  Q.    Okay.  You wanted her to leave him; but she would not,

18  correct?  And I don't blame you.  I don't blame you for trying

19  to get her to.  Correct?

20  A.    Yes.  I told her to leave him.  But I also know that she

21  did leave a few times and come back to Brent, and then he came

22  around and threatened to kill Brent.  And she left him because

23  she didn't want Brent or her boy, Zaiden, hurt.

24  Q.    Let's talk about Zaiden.  Okay?  Did she, or did she not,

25  leave Zaiden, her young child --

1  A.    She called every day and talked to Brent to see how the

2  boy was doing because she wasn't sure if Hunter -- she wanted

3  Zaiden to be around Hunter.

4  Q.    Sir, let me --

5  A.    So she was feeling Hunter out to see if she even wanted

6  her boy to come anywhere near him.

7  Q.    Let me finish my question.  In August of 2019, yes or no,

8  did she leave her child and go to Arkansas with Hunter

9  Carlstrom?

10  A.    I guess.  I don't know when she left, but I know she

11  disappeared.

12  Q.    She was gone for about 10 months, right?

13  A.    It was a while.

14  Q.    Okay.

15  A.    But she come back in that time and kept trying to come

16  back in that time.

17  Q.    Okay.

18  A.    Off and on.

19  Q.    Why don't we -- why don't we now listen to a little

20  snippet of, when you're not testifying, how it sounds when you

21  talk to Ms. Cook.

22        MR. MCGEE:  Can you please play exhibit -- it's that

23  first one in that file, a snippet.

24     (Playing audio)

25        MR. MCGEE:  Stop it right there.

1  BY MR. MCGEE:

2  Q.    Did she, or did she not, just say I kind of want you to

3  get her pictures of her and Hunter?

4  A.    Yeah, she did.  But, at that time, she was worried -- she

5  was still under his power --

6  Q.    Okay.

7  A.    -- even though he was gone.

8  Q.    So he's at --

9  A.    And I was trying to explain to her that you don't need him

10  there to look at; he is gone, is basically what I was trying to

11  tell her.

12  Q.    Okay.  Well, let's hear what you really said.

13           MR. MCGEE:  Push play.

14      (Playing audio)

15  BY MR. MCGEE:

16  Q.    And what does she say?  Never mind, never mind?

17  A.    Never mind.

18           MR. MCGEE:  Play the next call, please.

19      (Playing audio)

20  BY MR. MCGEE:

21  Q.    Mr. Allen, I want you to look at the man back there

22  sitting on the front row with that tie; and you tell him it was

23  blown out of proportion.

24  A.    I'm sorry for what happened to him.  I really am.  But I

25  do think that the real hero here was the officer that ran up

1   when she was -- everybody was getting shot, and the guns were

2   going off; and he dragged her away from the back wheel to

3   safety.

4              MR. MCGEE:  No further questions.

5              THE WITNESS:  But I am sorry what happened to that

6   officer.  I really am.

7              THE COURT:  All right.  You may step down.

8         All right.  Who is your next witness?

9              MR. PARK:  I call Ms. Cook to the stand.

10             THE COURT:  Okay.  Come around and be sworn.

11        (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

12             THE COURTROOM DEPUTY:  Take a seat and state your

13   first and last name for the record, please.

14             THE DEFENDANT:  Xaveriana Cook.

15             MR. PARK:  May I proceed, Your Honor?

16             THE COURT:  Yes.

17                  XAVERIANA COOK, DEFENDANT, SWORN

18                        DIRECT EXAMINATION

19   BY MR. PARK:

20   Q.   Ms. Cook, will you spell your first name for the court

21   reporter, please?

22   A.   X-a-v-e-r-i-a-n-a.

23   Q.   Okay.  So where you do you live, Ms. Cook?

24   A.   Rockford, Illinois.

25   Q.   How long have you lived there?

1  A.    Basically my whole life.

2  Q.    Okay.  And you're the parent now of two children, correct?

3  A.    Yes.

4  Q.    When Hunter Carlstrom was killed, you were pregnant with

5  his child?

6  A.    Yes.

7  Q.    And you were also -- you're currently expecting as we --

8  as of today?

9  A.    Yes, I am.

10  Q.    When are you due?

11  A.    I'm due March 4th.

12  Q.    Okay.  How long were you in custody before His Honor

13  allowed you out on bond?

14  A.    Two months, I want to say.

15  Q.    Okay.  And how long have you been out on bond?

16  A.    Over, I think, a year maybe, a little over a year.

17  Q.    Have there been any problems with your bond?  Have you

18  satisfied the conditions that were set by the Court?

19  A.    Yes.

20  Q.    There have been problems?

21  A.    No.  There's not been no problems.

22  Q.    Have you been attending counseling?

23  A.    Yes.

24  Q.    How frequently?

25  A.    Every two weeks.

1  Q.   Okay.  And has the counseling been helpful to you?

2  A.   Yes, it has.

3  Q.   You have a history of abuse in your background.

4  A.   Yes, I do.

5  Q.   And tell the Court a little bit about that.

6  A.   Growing up, my younger brothers -- their dad would abuse

7  me.

8  Q.   Okay.  In what way?

9  A.   He would, like, put me in the corner.  He would slap me in

10 my face.  Just stuff like that.

11 Q.   Okay.  How frequently did this happen?

12 A.   Almost all the time.

13 Q.   How did you react to it?

14 A.   I cried and was scared.

15 Q.   Okay.  And this was your stepfather, correct?

16 A.   Yes, sir.

17 Q.   And you have a -- children with Brent Hultgren, correct?

18 A.   Yes, I do.

19 Q.   Are you currently in a relationship with him?

20 A.   Yes, we are.

21 Q.   And is it -- the two of y'all are expecting the baby that

22 you're carrying?

23 A.   Yes.

24 Q.   Okay.  You engaged in a relationship with Hunter Carlstrom

25 when you were separated from Mr. Hultgren, correct?

1    A.    Correct.

2    Q.    How did you meet him?

3    A.    I met him through his brother.

4    Q.    Okay.  And did you know that he had a criminal record?

5    A.    I knew that he was in trouble, but I didn't know what for.

6    Q.    Okay.  Did he ever advise you what it was?

7    A.    No.

8    Q.    Okay.  How long were you in a relationship with him?

9    A.    Almost a year.

10   Q.    Okay.  And, when you started the relationship with him,

11   how long was it before you actually went off with him to

12   Arkansas?

13   A.    Probably 3 months, maybe.

14   Q.    Okay.  Were you pregnant at that time?

15   A.    No.

16   Q.    Okay.  And how long did you stay in Arkansas?

17   A.    We stayed there on and off, like, a month.  We stayed

18   there for a month and then come back and then -- like that.

19   Q.    Okay.  About how frequently would you come back to

20   Illinois?

21   A.    A lot.

22   Q.    Okay.  And how often did you have contact with your child

23   in Illinois?

24   A.    Almost every day.

25   Q.    Describe your relationship with Hunter Carlstrom.

1   A.    In the beginning, it was, like, a normal -- I guess you

2   could say a normal relationship.  We got along and stuff.  And

3   then, like, he started showing his true colors and showing the

4   kind of person he really was.

5   Q.    And what kind of person was that?

6   A.    Abusive and controlling.

7   Q.    Okay.  And how was he abusive?

8   A.    He would call me names and -- like, whenever he would get

9   mad at me, if we were, like, inside of his mom's house, he

10  would, like, throw me on the bed and, like, hold me down and

11  tell me that I wasn't going to go anywhere.

12        At his mom's house, there's, like, dead bolts on each side

13  of the door; so you have to have a key no matter what to unlock

14  it.  And he would always lock the door and, like, lock me in

15  the house so I couldn't go anywhere.

16  Q.    Okay.  How frequently did that happen?

17  A.    Almost all the time.

18  Q.    And did he ever try to disable your car?

19  A.    Yes.

20  Q.    What happened then?

21  A.    He tried to take, like, my tire off; so I couldn't go

22  nowhere.  Or, like, when I was driving, he would, like, pull

23  the wheel or whatever.  And then, like, when the car's on in

24  drive, he would turn my car off.

25  Q.    Okay.  You heard your grandfather testify about an

1   incident where he took the keys from you.  Did that incident

2   happen?

3   A.     Yes.

4   Q.     Was there verbal abuse from Mr. Carlstrom?

5   A.     Yes.

6   Q.     And what kind of abuse was that?

7   A.     He would tell me that I was a whore, and that I didn't

8   basically deserve to be a mom and stuff like that.

9   Q.     Okay.  Did he ever threaten your children?

10  A.     Yes.  He threatened me on Valentine's Day and said that he

11  would kill my son and his dad.

12  Q.     Okay.  And what about while you were pregnant?  Did he

13  threaten the child you were carrying?

14  A.     Yes, he did.  He told me that he would take the baby out

15  of my stomach, and I would never see him.

16  Q.     Okay.  Did he ever threaten to punch you in the stomach?

17  A.     Yes.

18  Q.     And tell the Court about that.

19  A.     It was, like, we were in a fight; and I told him that I

20  didn't, like, basically want to be with him anymore and stuff

21  like that.  And then he told me that I wasn't going to go

22  anywhere, and that he would take the baby basically out of my

23  stomach; and I would never see him again and just stuff like

24  that.

25  Q.     Okay.  So was there a time when he threatened to cut the

1  baby out?

2  A.    My mom -- I -- I got told that he said this, but he never

3  said that to me.

4  Q.    Okay.  Was there other physical abuse?  Did he ever choke

5  you?

6  A.    Yes, he did.

7  Q.    Did that ever lead to criminal charges against him?

8  A.    Yes.

9  Q.    Did you ever take a restraining order out against him?

10  A.    No.

11  Q.    Okay.  Was a restraining order ever in place?

12  A.    Not by me.  It might have been by, like, the State because

13  it was a domestic abuse.

14  Q.    Did the State place him under a restraining order?

15  A.    They might have, yes.

16  Q.    Okay.  There was an incident on March the 26th of 2020.

17  And I believe your grandfather's testified to some about that,

18  about a neighbor calling 911.

19  A.    Yeah.  That was when he took the lug nuts off of my tire

20  on my car and pushed me on the ground.  And, like, say -- I

21  can't remember exactly what he said to me, but he was being

22  really rude.  And I started to have, like, a panic attack; and

23  I couldn't breathe.  And then, before he left, he told me that

24  he loved me and that he was sorry.

25          MR. PARK:  Your Honor, may I produce an exhibit?

```
 1              THE COURT:  You may.

 2  BY MR. PARK:

 3  Q.    Ms. Cook, I'm showing you an exhibit.

 4  A.    It's kind of blurry.

 5  Q.    This is a criminal complaint from the County of Winnebago

 6  in Illinois.  What county do you live in?

 7  A.    Winnebago.

 8  Q.    Okay.  And this is a felony assault charge -- or an

 9  aggravated battery charge against Hunter Carlstrom from

10  March the 26th of 2020.  Is that from the day that he assaulted

11  you that you were telling us about?

12  A.    Yes.

13  Q.    And then, on the back page, there's a second count of

14  domestic battery and also from the same date.  Are you aware of

15  that?

16  A.    Yes.

17  Q.    What --

18              MR. PARK:  Your Honor, I'd like to offer this -- this

19  is a certified copy.  I'd like to offer this as Defense

20  Exhibit 1.

21              THE COURT:  Any objection?

22              MR. DABBS:  No objection.

23              THE COURT:  Very well.

24              (EXHIBIT NO. D-1 WAS RECEIVED INTO EVIDENCE)

25  BY MR. PARK:
```

1  Q.    Ms. Cook, what did Mr. Carlstrom do --

2          THE COURT:  Hand it to --

3  BY MR. PARK:

4  Q.    Did Hunter Carlstrom find out that there was a warrant for

5  his arrest?

6  A.    Yes, he did.

7  Q.    And what did he do?

8  A.    He thought that I was the one that had called the cops and

9  told me that I was a cop caller, and he basically wanted

10 nothing to do with me.

11 Q.    Okay.  What happened after that?

12 A.    I told him that I wasn't the one that called the cops.

13 And then he ended up calling his mom and talking to his mom on

14 the phone.

15 Q.    Okay.  Now, you've shared with us some of the abuse.  Did

16 you issue text messages about the abuse during the time frame

17 that you were with Hunter Carlstrom?

18 A.    Yes.

19 Q.    And who would you be sending these texts to?

20 A.    I would be talking to my son's dad, my oldest son's

21 father.

22 Q.    Did you also take photographs of your -- of the injuries?

23 A.    Yes, I did.

24 Q.    And these injuries came from Hunter Carlstrom?

25 A.    Yes.

1  Q.    Okay.

2          MR. MCGEE:  Your Honor, if he can lay the proper

3  foundation on these.  But my understanding is, from looking at

4  these previously, that there are a lot of text messages that

5  were -- that her mom had sent to someone else or other people

6  authored other than Ms. Cook.

7       And, so, I would object if there's no foundation laid

8  on -- there are no dates on them.  There's no sender.  There's

9  no receiver.  There's a lot of text messages in here, and half

10 of them don't even have any kind of indicia of identification

11 on them.

12         THE COURT:  The objection's sustained.

13         MR. PARK:  Can I lay the foundation, Your Honor?

14         THE COURT:  I don't know if you can or not.  You can

15 attempt to.

16         MR. PARK:  Thank you.

17 BY MR. PARK:

18 Q.    Ms. Cook, I want to show you an exhibit that's dated March

19 the 26th where there's a response saying "OMG what happened."

20 Does OMG stand for oh my god?

21 A.    Yes, it does.

22 Q.    And then the response is "he hit me."  And who sent that

23 message?

24 A.    The who hit me?

25 Q.    Yes.

1  A.    It was me.

2  Q.    Okay.  And who were you sending this to?

3  A.    I was sending it to the neighbor across the street that

4  had lived upstairs from the person that had called the cops

5  that same day.

6  Q.    Okay.  So you're the one who authored this text message?

7  A.    Yes.

8  Q.    On March the 26th of 2020?

9  A.    Yes.

10 Q.    Did you also take photographs of your injuries?

11 A.    Yes, I did.  I had my grandma take the picture that you're

12 about to show.

13 Q.    And you said he choked you that day?

14 A.    Yes.

15 Q.    I'm showing you a photograph, and it indicates -- it looks

16 like your neck is pretty red there.  And what caused that?

17 A.    He choked me.  And I think it -- I don't know if it was

18 his nail or what that went into the side of my neck.

19 Q.    Okay.  How long did that incident take?

20 A.    Probably 10 or 15 minutes.

21 Q.    I'm going to show you another photograph.  Can you explain

22 to the Court what that is?

23 A.    That is my stomach.

24 Q.    Okay.  And are there any marks on there?

25 A.    Yes.

1  Q.    And what caused those marks?

2  A.    I was laying down; and he was on top of me and, like, was

3  trying to get me not -- not be able to move.

4  Q.    Okay.

5              THE COURT:  I'm sorry.  I didn't understand.  What is

6  this a photo of?

7              THE DEFENDANT:  It's a picture of my stomach.  And

8  the mark on the bottom of it is from him.  I don't know if it's

9  from me kicking him or trying to get him off of me or, like,

10 what it's from, but.

11 BY MR. PARK:

12 Q.    Okay.  But does that -- does the photograph depict

13 injuries that you received from Hunter Carlstrom?

14 A.    Correct.  Yes.

15 Q.    Can you identify this one?

16 A.    Yes.

17 Q.    Are you the one who authored -- well, what did you author

18 in this text message?

19 A.    That my shirt was ripped; and I have a bloody finger from,

20 like -- because I would put my key ring around my finger.  That

21 way he couldn't get my keys out of my hand.  And he would

22 always end up ripping them out of my hand and making my finger,

23 like, bleed.

24 Q.    Okay.  Now, you talked about him taking your keys

25 previously too.  And had he done that that day?

1  A.    Yes.  Yes, he did.

2  Q.    Can you identify this photograph?

3  A.    That's a bruise on my arm from him grabbing me.

4  Q.    Okay.  And was this all taken around the same time frame?

5  A.    I think so, yeah.

6  Q.    Okay.  And what does this photograph depict?

7  A.    That's a bruise on my arm from him grabbing me.

8  Q.    This is kind of a composite of those photographs.  And

9  somebody's asking you what's his deal.  And what do you say?

10  What's your reply at the very bottom?

11  A.    "All of them are from last week and the first ones are

12  from today."

13  Q.    Okay.  What do we see in this photograph?

14  A.    You can't really see it, but there's a bruise on my arm.

15  Q.    Okay.  Was it caused by Hunter Carlstrom?

16  A.    Yes.

17  Q.    This next one also has photographs of your injuries at the

18  top.  And then somebody's asking you about the injuries, and

19  what's your response?

20  A.    Got grabbed trying to leave and all my clothes are ripped

21  off of me.

22  Q.    And then what do you say?

23  A.    And then, after that, my friend asked if I would be okay;

24  and I told her I was going to be okay.

25  Q.    In that middle message, though, you say, "Don't tell

1  anybody, please."

2  A.    Yeah.

3  Q.    Why did you write that?

4  A.    Because I didn't want there to be problems between me and

5  him and him try to hurt me again.

6  Q.    Can you identify this photograph?

7  A.    That's a picture of my shirt being ripped.

8  Q.    Okay.  Did he rip your clothes?

9  A.    Yes, he did.  I tried to, like, get away from him; and he,

10  like, grabbed me by my jacket.

11  Q.    What does this photo depict?

12  A.    A picture of a bruise on my arm.

13  Q.    Okay.  Who put the bruise there?

14  A.    Hunter.

15  Q.    How frequently was he physically abusive with you?

16  A.    Almost every day.

17  Q.    Can you identify this document?

18  A.    Yes.  That's to my friend.

19  Q.    Is this something that you drafted?

20  A.    No.  That's -- wait.  Yeah, that's from me.

21  Q.    Okay.  Do you know who you sent it to?

22  A.    Could have been my friend Jasmine, but I'm not for sure.

23  Q.    Okay.  And do you know what time frame it was when you

24  drafted this?

25  A.    Probably in, like, the middle of the day, like, the

1  afternoon maybe, late evening.

2  Q.    And you note in there that y'all got into a fight, and he

3  took your keys from you and also took your phone from you,

4  correct?

5  A.    Yes.

6  Q.    And, toward the middle there, he says -- or you write,

7  "But we haven't been there since he tells told me that if I was

8  pregnant before when I was pregnant that if I wasn't going to

9  be with him that I wasn't going to have the baby, and he would

10 punch the F out of my stomach so I would lose the baby."  Is

11 that correct?

12 A.    Yes.

13 Q.    Did he make that threat?

14 A.    Yes.

15 Q.    And one final document.  What does this photograph show?

16 A.    That's what happened when he pulled the keys out of -- off

17 from around my finger.

18 Q.    Okay.  Do you know approximately how recent this was in

19 relation to when Hunter Carlstrom was killed?

20 A.    Probably around March when he had pushed me on the ground

21 and choked me.

22 Q.    Okay.

23        MR. PARK:  Your Honor, I would offer the photographs

24 and texts that Ms. Cook testified to.  I would offer them as a

25 composite exhibit.

1              THE COURT:  All right.  They'll be received, the ones

2    that she personally identified.

3              (EXHIBIT NO. D-2 WAS RECEIVED INTO EVIDENCE)

4    BY MR. PARK:

5    Q.    Was Hunter Carlstrom a drug user?

6    A.    Yes.

7    Q.    Did he use drugs around you?

8    A.    He smoked weed around me, but he never did nothing else

9    around me.

10   Q.    Okay.  What was his drug of choice?

11   A.    I'm guessing meth, but I'm not for sure.  It could have

12   been crack too.

13   Q.    Okay.

14             THE COURT:  I'm sorry.  I did not understand what

15   you're saying.

16             THE DEFENDANT:  His drug of choice was meth, I think;

17   but it could have been crack too.

18             THE COURT:  All right.

19             THE DEFENDANT:  But, for the most part, he only

20   smoked weed around me.

21   BY MR. PARK:

22   Q.    Okay.  Now, we filed an objection to the Presentence

23   Report about some statements made by Bill Carlstrom.  Do you

24   know who he is?

25   A.    Yes, I do.

1  Q.    Who is he?

2  A.    That is Hunter's dad.

3  Q.    Okay.  And I want to turn your attention to the time frame

4  around when Hunter Carlstrom was killed.  There was an

5  individual named James Sartorelli who was murdered, correct?

6  A.    Correct.

7  Q.    Did you know him?

8  A.    I knew of him.  I didn't really even know him, know him

9  like that.

10  Q.    Did Hunter Carlstrom know him?

11  A.    I'm assuming so.  He worked with him.

12  Q.    He worked with him?

13  A.    Yes.

14  Q.    Doing what kind of work?

15  A.    They would go, like, clean out, like, the -- at the farm,

16  like, the cows.  They would, like, go to houses and, like,

17  build, like -- basically build a house; put, like, the walls up

18  and everything.

19  Q.    Okay.  And you -- one of the counts that you pled guilty

20  to was being an accessory after the fact to the robbery and

21  murder of Mr. Sartorelli; is that correct?

22  A.    Correct.

23  Q.    Now, prior to his murder, did Hunter Carlstrom tell you

24  that he was going to kill Caveman -- or Sartorelli?

25  A.    Yes.

1  Q.    Okay.  And did he tell you that more than once?

2  A.    Yes.

3  Q.    Did you believe him?

4  A.    No, I did not.

5  Q.    And why not?

6  A.    Because I -- I just don't -- I don't know.  It just wasn't

7  something that I thought that somebody would actually really --

8  want to actually really do it.  Like, you do see that kind of

9  stuff in, like, the movies.  You don't really see that in real

10 life.

11 Q.    Did he say why he was going to kill him?

12 A.    He had told me that he just had money and stuff that he

13 wanted.

14 Q.    Okay.  And how did you learn that Sartorelli had been

15 killed?

16 A.    He told me that he killed him.

17 Q.    Who told you?

18 A.    Hunter Carlstrom.

19 Q.    What did he say that he'd done?

20 A.    He told me that he shot him.

21 Q.    Okay.  How did you react to that?

22 A.    I was in shock.  Like, I didn't -- I didn't believe that

23 he actually really did it.

24 Q.    Okay.  And what happened after that?

25 A.    He told me to get in the car and leave with him.

1  Q.    Okay.  Did he have loaded weapons with him?

2  A.    Not that I know of.  He said -- he told me he did, but I

3  never saw them.

4  Q.    Okay.  So you got the clothes and then what?

5  A.    And then we had left and went to Andy Capps' house.

6  Q.    Okay.  And how did you know Andy Capps?

7  A.    I know him through Hunter.

8  Q.    Okay.  And did Hunter give him any instructions?

9  A.    He -- when we got to his house?  Yes.  He told him to go

10 and burn his camper or trailer down or something like that.

11 Q.    Okay.  Were you with Hunter Carlstrom when he killed James

12 Sartorelli?

13 A.    No, I was not.

14 Q.    Okay.  Now, then, after the fact and after you learned

15 that Sartorelli was killed, did you drive with Hunter Carlstrom

16 away from Arkansas?

17 A.    Yes, I did.

18 Q.    Okay.  At any time, did you attempt to leave?

19 A.    I tried to, but he wouldn't let me.

20 Q.    Okay.  And tell the Court about that.  How did you try to

21 leave?

22 A.    I tried to tell him that I wanted to go back home, and he

23 told me that I couldn't go nowhere.

24 Q.    Okay.  You heard your grandfather mention about the use of

25 your cellphone after Mr. Sartorelli's murder.  And tell the

1  Court about that; were you able to freely use your phone?

2  A.    No, I wasn't.  He told me to turn my location off and not

3  to get on my phone at all.

4  Q.    Okay.  And was he with you 24 hours a day?

5  A.    Yes.

6  Q.    Was there any time when you were able to communicate with

7  your grandparents or anyone else?

8  A.    No.  He was just -- he was by my side all -- like, 24/7,

9  all the time.

10 Q.    Your grandfather mentioned getting some text messages that

11 didn't appear to be from you.  Were you texting your

12 grandfather?

13 A.    I don't remember texting him, no.

14 Q.    Okay.  If somebody was texting him, would it have been

15 Hunter, to the best of your recollection?

16 A.    More than likely, yeah.

17 Q.    Okay.  Now, then, you talked about the level of abuse that

18 you suffered during your relationship with Mr. Carlstrom.  So

19 the question is, why didn't you leave?

20 A.    I was scared.  I didn't want him to hurt my family.

21 Q.    Okay.  Were you scared of what he would do to you

22 personally?

23 A.    Yes.

24 Q.    What about your grandparents?

25 A.    I was -- yes.  They're like my (inaudible).  So, yeah, I

1  was definitely scared for them.

2  Q.    Okay.  Was there a time when you attempted to have your

3  grandparents come from Illinois to pick you up in Arkansas?

4  A.    Yes, sir.  There was one time when I had my grandparents

5  meet me halfway.

6  Q.    And where did they meet you?

7  A.    I want to say it was somewhere in Missouri.  I can't

8  remember the town, but it was in Missouri.

9  Q.    Okay.  And were they coming to meet you or coming to pick

10  you up?

11  A.    They were coming to meet me halfway; so that way, like, if

12  anything happened, they were there.

13  Q.    Okay.  You told me that -- or told us that this abuse was

14  pretty much a daily thing with Mr. Carlstrom, so why did you

15  keep going back to him?

16  A.    Because he would threaten to hurt me or hurt my family and

17  my son, and I didn't want him to do that.

18  Q.    Was there a charming side of him?

19  A.    Yes.  He knew how to -- he knew how to speak.  He knew how

20  to talk.  He knew how to use his words.

21  Q.    Okay.  And were there times when he was apologetic?

22  A.    He would -- he would say he was sorry, but he would do it

23  all over again.

24  Q.    Did he ever buy you gifts?

25  A.    No.

COOK - DIRECT

```
1  Q.    Okay.  Did he ever buy you flowers?

2  A.    No.

3  Q.    Okay.  There was a ring that was purchased in Memphis at a

4  Walmart.  Did he purchase that ring?

5  A.    I'm assuming so, yes.

6  Q.    Okay.  Was it an engagement ring?

7  A.    No.  It was not an engagement ring.  From my

8  understanding, it wasn't.  But, to him, it could have been.

9  Q.    Okay.  Now, were you with him when he purchased the ring?

10 A.    No, I was not.

11 Q.    Where were you?

12 A.    I was at home.

13 Q.    Okay.  And, after that, you -- you came to -- through

14 Oxford, Mississippi to get the ring sized, correct?

15 A.    Correct.

16 Q.    And where were you headed?

17 A.    To -- I can't remember the town, but it was here.

18 Q.    Was it Vardaman, Mississippi?

19 A.    Yes.

20 Q.    And who did y'all stay with?

21 A.    His best friend --

22 Q.    Yeah.

23 A.    -- Spencer and Jaime.

24 Q.    Last name Williams?

25 A.    Yes.
```

1  Q.    How long did you stay with them?

2  A.    We stayed there for, I think, a week.

3  Q.    There's an incident where -- or Spencer Williams gave a

4  statement saying he saw a gun in one of your bags.  And what's

5  your response to that?

6  A.    I never carried the gun in my bag.  I never even touched

7  the gun.

8  Q.    Okay.  So would there have been a -- a gun in one of your

9  bags?

10 A.    Not in one of my bags, no.

11 Q.    Did you have a purse?

12 A.    I have, like, a -- like, a drawstring backpack thing.  It

13 was black.  But I -- there was never none of his belongings in

14 it.

15 Q.    Okay.  Another thing, too, relating back to the objection

16 that we filed, Bill Carlstrom said that -- that he talked to

17 you after Mr. Sartorelli had been murdered, and you said that

18 you loved Hunter and wanted to ride with him.  What's your

19 response to that?

20 A.    I never speak -- spoke or saw his dad after all that

21 happened.

22 Q.    Okay.  Did you ever make a statement like that to him?

23 A.    No, I did not.

24 Q.    Okay.  What was your relationship with Bill Carlstrom?

25 A.    I -- I never really had a relationship.

1  Q.    Okay.  He also alleged that you were drinking hard liquor

2  while you were pregnant.  Is that correct?

3  A.    Yes.  He said that, but I never drank with any of my kids.

4  Q.    And he also talked about you shooting guns a good bit.  Is

5  there any truth to that?

6  A.    No.

7  Q.    All right.  When you -- after staying in Vardaman, you

8  came back to Oxford.  And then there's a time when you were

9  pulled over again and Hunter was with you.

10  A.    Yes.

11  Q.    Pulled over here in Oxford, right?

12  A.    Yes.

13  Q.    Now, did Hunter Carlstrom always carry a gun with him?

14  A.    As far as -- yes, sir.  When we were -- when we were,

15  like, in the Arkansas area.  In Illinois, he never had a gun.

16  Q.    Okay.  What about after Mr. Sartorelli's murder, did he

17  carry a gun with him at all times?

18  A.    Yes.

19  Q.    Did he make comments to you that he was not going back to

20  prison?

21  A.    Yes.

22  Q.    Did he tell you that he would have a shoot-out with the

23  police?

24  A.    Yes.

25  Q.    And that, if he was going to die, that that would be the

1  way that he would go out?

2  A.    Pretty much, yeah.

3  Q.    Now, then, were you ever around law enforcement where he

4  did not shoot them?

5  A.    Yes.  When we had got pulled over in Conway, I think it

6  is, or something like that, when I got my tickets.

7  Q.    In Calhoun County, Mississippi?

8  A.    Yes.

9  Q.    A highway patrolman pulled you over?

10  A.    Yes.

11  Q.    And why were you pulled over?

12  A.    Because I was speeding or something like that.

13  Q.    Okay.  And did -- was Hunter Carlstrom with you in the

14  car?

15  A.    Yes.

16  Q.    And the officer came and talked to both of you?

17  A.    Yes.

18  Q.    Did he -- did Hunter make any attempt to shoot the

19  officer?

20  A.    No.

21  Q.    Okay.  So, when Hunter was making these comments about how

22  he was going to go out in a shoot-out with the police, did you

23  believe him?

24  A.    No.

25  Q.    What did you think he would do?

1 A.    I just figured he would obey the law and actually do what

2 he was told.

3 Q.    When you were stopped by the highway patrolman, did you

4 tell the patrolman that he was a wanted -- that Hunter

5 Carlstrom was a wanted man and armed and dangerous?

6 A.    No.

7 Q.    And why not?

8 A.    Because I was scared of him.

9 Q.    Okay.  Scared of Hunter?

10 A.    Yes.  And I didn't want to say something to the cops, and

11 then he pull a gun out.  And then they start having a shooting

12 war; and I end up getting shot, so.

13 Q.    Okay.  And, then, on the day that Hunter was killed, did

14 you believe that he was going to have a shoot-out with the

15 police on that day?

16 A.    No, I did not.

17 Q.    When you were pulled over, explain what happened when you

18 first had contact with a law enforcement officer.

19 A.    The first time we got pulled over?

20 Q.    No.  This -- this is in Oxford on the --

21 A.    Oh.

22 Q.    -- day that Hunter was killed.

23 A.    Repeat your question.

24 Q.    Okay.  You got pulled over.  And what happened next?

25 A.    We got pulled over.  I'm guessing that it's the cop that

1   got shot.  He told us to put our hands up, and I put my hands

2   up.  And he kept repeating it because Hunter wasn't obeying --

3   you know, listening to what he was saying.  And I had my hands

4   up.

5        And I asked, I think, that same cop if I could get out of

6   the car; and he said yes.  So I had my one hand up and

7   unbuckled my seat belt.  And then I opened my door, and I got

8   out.  And I had my hands up facing the back of my car.

9   Q.   Okay.  Were you in a safe location where you could readily

10  talk to the officer?

11  A.   No.

12  Q.   Okay.  And did you tell that officer that Hunter was

13  wanted and armed and dangerous?

14  A.   No, I did not.

15  Q.   Why did you not do that?

16  A.   Because, as soon as I got out of the car and put my hands

17  up and he had got tased, that's when I started hearing the

18  gunfire; so I hurried and got on the ground to protect myself.

19  Q.   Okay.

20            THE COURT:  I'm having a lot of difficulty

21  understanding her.

22  BY MR. PARK:

23  Q.   Okay.  You need to try to enunciate your words more

24  clearly.  Okay?  So talk a little slower and make sure you

25  pronounce everything clearly.  Okay?

1  A.    Okay.

2  Q.    And you said the officer told you to put your hands up --

3  A.    Yes.

4  Q.    -- and then you got yourself out of the car?

5  A.    Yes.

6  Q.    How long did all of this happen?  How long did it take for

7  you to get out of the car after you were pulled over?

8  A.    Not even 5 minutes.

9  Q.    Okay.  And why did you not tell the officer that Hunter

10  had a gun?

11  A.    Because they had just had a -- like, there was gunfire and

12  everything.  So I was in shock; and that wasn't, you know, the

13  first thing that was on my mind.

14  Q.    No.  I mean before the shooting began, when the officer

15  first came to the car.

16  A.    Oh.  Because he had a gun, and he could have shot me.

17  Q.    Okay.  Were you fearful that you would be injured if you

18  said anything like that?

19  A.    Yes.

20  Q.    You think Hunter Carlstrom was capable of hurting you for

21  doing something like that?

22  A.    Yeah.  If he just killed somebody, why wouldn't he not try

23  to do that to me?

24  Q.    Now, I think it's been mentioned that the deputy marshal

25  who was shot is here in the courtroom today.  What would you

1  say to him?

2  A.    I would tell him that I'm sorry that he would have got

3  shot; and I didn't mean for none of that to happen, I guess.

4  Q.    Okay.  Now, then, in regards to your participation in all

5  of the -- in this entire episode leading up to the deputy

6  marshal being shot, did you understand the scope and the

7  structure of what Hunter Carlstrom was doing in terms of the

8  robbery and the murder?

9  A.    No, I did not.

10 Q.    Did you voluntarily drive with him in the vehicle, or

11 would you say you were acting voluntarily?

12 A.    I would not say -- no.  I was not voluntarily going with

13 him, no.

14 Q.    You gave --

15        THE COURT:  I have no idea what she just said.

16        MR. PARK:  Okay.

17 BY MR. PARK:

18 Q.    Try to repeat that again.

19 A.    No.  I would not say that I voluntarily drove with him.

20 Q.    Okay.  And why would you say that?  Well, let me -- before

21 I get there, just -- in your statement, there's a comment that

22 says that you went with Hunter "willingly."  And how did that

23 word end up in that statement?

24 A.    I -- when I was talking to the -- to officers or whatever

25 they were, they were, like, asking me, like, if I willing went

1  with him.  And I -- I never used the word *willingly*.  Like, I

2  wouldn't -- I wouldn't use that word.  But I guess that that

3  was, like, the way that they took it, I guess?  I'm not sure.

4  Q.    How old are you?

5  A.    I'm 25.

6  Q.    And how old were you when this incident occurred?

7  A.    Twenty-three.

8  Q.    Okay.  And, in terms of your assisting with him, now you

9  admit that you drove the vehicle after the murder of

10 Mr. Sartorelli, right?

11 A.    Correct.

12 Q.    What else did you do to enable or assist Mr. Carlstrom?

13 A.    I don't really think I did anything.

14 Q.    Okay.  Did you plan or organize any of the activities?

15 A.    Definitely not.

16 Q.    Did you have any decision-making authority?

17 A.    No.

18 Q.    Or were you influencing Hunter to do any of these actions?

19 A.    No.

20 Q.    Did you try to prevent him from doing these?

21 A.    Yes, I did.

22 Q.    Did you gain any benefit from the actions of Hunter

23 Carlstrom in murdering Sartorelli or shooting the deputy

24 marshal?

25 A.    No.  I feel like he made my life a living hell.

1  Q.    Now, you did -- it was mentioned that -- that you got the

2  ring from Walmart.

3  A.    Yes.

4  Q.    Is that something that you picked out?

5  A.    No.

6  Q.    Is that something that Carlstrom bought with money he

7  stole from Sartorelli?

8  A.    He might have.  I'm not for sure.

9  Q.    Do you know where Hunter Carlstrom got his money?

10 A.    No.

11 Q.    Do you know how much money he made when he was working?

12 A.    No.  I never asked.

13 Q.    Did he work the entire time that y'all were in Arkansas?

14 A.    As far as I knew.  That's what he told me he was doing.

15 Q.    Okay.  Did he appear to have a lot of money?

16 A.    Say that again.

17 Q.    Did he -- did Hunter spend a lot of money?

18 A.    I'm not for sure.  I never really asked or -- I just

19 didn't ask about anything like that.

20 Q.    Okay.

21        THE COURT:  All right, Counselor, time to wrap it up.

22 And we'll let the Government cross-examine in a few minutes,

23 and then we'll take a recess.

24        MR. PARK:  Thank you, Your Honor.

25 BY MR. PARK:

1  Q.    While you've been out on bond, have you been studying for

2  your GED?

3  A.    Yes, I have.

4  Q.    Taken the test?

5  A.    Yes.

6  Q.    And what are your plans for the future after you get all

7  of this behind you?

8  A.    I want to try to get a -- go into, like, a career or

9  something maybe.

10  Q.   What kind of work have you done in the past?

11  A.   Most of my work has been factory work.

12  Q.   Okay.

13            MR. PARK:  I tender the witness, Your Honor.

14            THE COURT:  Thanks.

15       All right.  The Government may cross-examine.

16                      CROSS-EXAMINATION

17  BY MR. MCGEE:

18  Q.   Ms. Cook, I apologize if I'm a little scattered.  I -- I

19  heard a lot of new things that I've never heard before.  And

20  I'll be honest with you, it's hard to keep up when somebody's

21  lying.  It's hard.

22  A.   Okay.

23  Q.   Let's go back to where we looked at the pictures that

24  were, I guess, from a different phone or something.  The

25  pictures of you that -- I think you said Mr. Carlstrom hurt you

1  that day?  Is that right?

2  A.    Uh-huh.  Yes.

3  Q.    You have to speak.  Okay.  And, ma'am, if you don't mind,

4  could you spit your gum out?  It's a little distracting.  That

5  may be why we can't hear you.

6      So my understanding is -- from what you just testified to

7  under oath, is that he was taking the lug nuts off your car?

8  A.    Yes.

9  Q.    And then y'all got in a verbal altercation, and he pushed

10  you on the ground and choked you?

11  A.    Yes.

12  Q.    Okay.  That's what I thought I heard you say under oath.

13  (Pause).  Is this your handwriting?

14  A.    Yes.  Yes, it is.

15      MR. MCGEE:  Your Honor, I'm showing her what's the

16  MBI -- the statement that was taken from MBI from Ms. Cook.

17  It's a handwritten statement that she just admitted was her

18  handwriting.

19  BY MR. MCGEE:

20  Q.    I'm going to read it.  In Illinois, we got back to his

21  mom's.  Then he took my lug nuts off my car.  He was talking

22  crap while doing it, so that upset me.  So I started hitting

23  him.  I called my grandma to come get me because I couldn't --

24  he said whoever is coming back, I will come back out, etc.,

25  etc.  Then you talk about him shoving you.

1      Now, you didn't just testify to that under oath in court,

2 that you hit him first, did you?

3 A.    No.

4 Q.    Could that also be domestic violence?

5 A.    I guess.  Yes.  You could say that.

6 Q.    Okay.  You didn't want to tell the Court that, did you?

7 A.    I don't -- like, a lot's happened; so I didn't remember

8 that that happened.

9 Q.    I don't blame you.  Now, are we really going to say that

10 you didn't make the TikTok videos?  Is that where we are today?

11 A.    No.

12 Q.    Did you make the TikTok videos?

13 A.    No, I did not.

14      MR. MCGEE:  Mr. Dabbs, could you play the fist TikTok

15 video dated May 3rd, 2020.

16      THE COURT:  I've heard a lot about TikTok videos.  I

17 don't know what they are.  Are you going to show us?

18      MR. MCGEE:  I'll ask her.

19 BY MR. MCGEE:

20 Q.    Ms. Cook, what is TikTok?  If you could explain to the

21 Court.

22 A.    It's, like -- kind of, like, different music with -- like,

23 you just do, like -- like, viral dances and stuff, I guess.

24 Q.    Okay.  Let me -- let me -- I'm going to ask you a

25 question; you tell me if you agree.  Is it a social media

1  platform where you can make a slideshow with music, or you can

2  make a video with music?

3  A.    Yes.

4  Q.    Okay.  And, so, you have an account, correct?

5  A.    I have -- yes, I do.

6  Q.    And --

7  A.    Well, I did.

8  Q.    Okay.  You did during this time period, right?

9  A.    Yes.

10  Q.    And these TikTok videos that came from your phone and your

11  TikTok account --

12  A.    Yes.

13  Q.    -- you're saying under oath that you did not make?

14  A.    I -- that's my account, but I didn't make them videos.

15  Q.    You didn't make the videos?

16  A.    No, I didn't.

17  Q.    You're going to say that under oath?

18  A.    Yes.  I did not make the videos, but this is from my

19  account.

20  Q.    Okay.  May 3rd, this is two days, if my math's correct,

21  before the murder of James Sartorelli.

22        (Playing video)

23  BY MR. MCGEE:

24  Q.    Okay.  So this is a slideshow.  Who is that person in that

25  picture?

1   A.     Me and Hunter.

2   Q.     And there's a slideshow with a song that says "when I'm

3   with you I'm my happiest."  But you're telling this Court under

4   oath even though they were in your phone on your TikTok account

5   you did not make the videos?

6   A.     No, I did not.

7          MR. MCGEE:  Play the next one, please.  May 13th, two

8   days before Deputy Marshal Dickerson was shot.

9          (Playing video)

10  BY MR. MCGEE:

11  Q.     You didn't make that video, did you?

12  A.     No, I did not.

13         MR. MCGEE:  Your Honor, I'd like to show the witness

14  what has been marked as Government's Exhibit 2 for

15  identification purposes.  And I apologize; I need the ELMO.

16  BY MR. MCGEE:

17  Q.     Let me guess, you didn't create this account; and you

18  didn't put "widow" there?

19  A.     It says August 2020.  So, yes, I did make that account.

20  Because I wasn't -- wasn't with Hunter, so yes.

21  Q.     So you did, though?

22  A.     At this time, I mean -- I mean --

23  Q.     So you did say that you were widowed?

24  A.     Say that again.

25  Q.     You did say that you were a widow; your relationship

1  status was widow?

2  A.    Yeah.  I did that as a joke.

3  Q.    Oh.  Okay.  So it's funny.  I got you.  Now, this was in

4  December.  Agent Niedzwecki pulled this in December of 2021.

5  And it still, under account, says in a relationship with Hunter

6  Carlstrom.  Did he put that on there too?

7  A.    No.  That was my main account, but I don't --

8  Q.    I'm sorry?  What did you say?

9  A.    I said that was my main account, but I don't use that

10  anymore.

11  Q.    Okay.  What about this?  Xaveriana Allen.  This is on your

12  boyfriend, Bubba's, account.  This is a post that you put under

13  a comment under one of his posts.  And it says, next, Kelsey

14  Duncan -- next is this stupid court shit.  Did you say that?

15  A.    Yes, I did.

16  Q.    Thank you.

17        THE COURT:  Excuse me.  Put that back up.  I didn't

18  get to see it.

19        MR. MCGEE:  Yes.

20  BY MR. MCGEE:

21  Q.    So, right here, Xaveriana Allen -- that's your

22  grandparents -- that's your grandparents' last name, correct?

23  A.    Correct.

24  Q.    And you wrote this?

25  A.    Yes.

1  Q.    "Next is this stupid court shit."  That's your words,

2  right?

3  A.    Yes.

4  Q.    Not Hunter's.  And I got your receipt here.  You -- you

5  helped him -- y'all secured a room and ate hamburgers, didn't

6  you, at the Motel 6 in Memphis, Tennessee, didn't you?

7  A.    We never ate hamburgers; but, yes, sir, he told me to get

8  that room.

9  Q.    And this is in your name, right?

10  A.    Yes.

11  Q.    So, if the marshals were looking for a hotel room in his

12  name, they wouldn't find it, would they?

13  A.    No.  He told me to get the room.

14  Q.    Now, you got a head start on me on this one.  You've seen

15  these pictures that came out of your phone during the time.

16  Are you going to tell the -- are you going to tell this Court

17  under oath -- this is Government's Exhibit 5, collective

18  exhibit.  Are you going to tell this Court under oath that

19  Hunter Carlstrom took that picture and placed heart emojis and

20  a praying hand on those pictures?

21  A.    No, I'm not.

22  Q.    Who made that?  Who took those pictures?

23  A.    I took that picture.

24  Q.    Who put the emojis on there?

25  A.    Myself.

1  Q.    Thank you.  What about this picture; who took that

2  picture?

3  A.    Me.

4  Q.    Okay.  And that was with your phone, correct?

5  A.    Correct.

6  Q.    And that's Hunter Carlstrom, correct?

7  A.    Yes.

8  Q.    The third picture, you're not telling this Court that

9  Hunter Carlstrom took this picture and wrote "love" under it,

10  are you?

11  A.    The "love" part is a filter.  But, no, he didn't.

12  Q.    You did that, correct?

13  A.    Yes.

14  Q.    And this was during the time of the criminal escapade,

15  correct?

16  A.    Yes.

17  Q.    And who took this picture?

18  A.    Me.

19  Q.    And who put those hearts there around his face?

20  A.    It's a filter.

21  Q.    A filter.  You did that, correct?

22  A.    Yes.

23  Q.    And this last one, that is the pistol that was used to

24  shoot Bob Dickerson and to shoot James Sartorelli.  This is a

25  picture of you and him.  You have a devil emoji on your eye,

COOK - CROSS

1   correct?

2   A.    Yes.

3   Q.    You took that picture, didn't you?

4   A.    Yes.

5   Q.    And you put that devil emoji there, didn't you?

6   A.    Yes.  There's different filters you can get that's on

7   Snapchat.

8   Q.    Right.  On Snapchat.  So did you post this on Snapchat?

9   A.    No.

10  Q.    Okay.  I'm confused again about the bag, the black bag.

11  We talked about the black back -- we talked about that in open

12  court.  Mr. Dabbs -- because I had COVID -- read this into the

13  record, the factual basis, which is very important, correct?

14  A.    I'm guessing so.  I never (inaudible --

15  Q.    Say that again.

16  A.    I said I'm guessing so.  I never had to do none of this,

17  so I'm not for sure how everything works.

18  Q.    So you're aware Spencer Williams, who y'all are staying

19  with -- who is your friend, by the way, correct?

20  A.    He was not my friend.  He was --

21  Q.    Was Jaime your friend?

22  A.    No.

23  Q.    Okay.  Well, that's not what you told Agent Niedzwecki.

24  He saw a Glock pistol in your bag, in your bag.  And he became

25  angry and said, Carlstrom, I know you're a felon; you can't

1  have a gun.  And he responded, oh, that's Cook's gun.  And then

2  you sat there silent.  You didn't say a word, did you?

3  A.    No.  I didn't say nothing because I wasn't in the car when

4  they were having that conversation.  So I never even heard that

5  conversation.

6  Q.    So even though you admitted in open court you had no

7  problems with this, you agreed to the factual basis except for

8  one other thing, are you telling this Court that that gun was

9  not in your bag?

10  A.    No.  I never touched the gun.

11  Q.    That's not what I asked.  Was a gun in your bag?

12  A.    No.  I never carried a purse.

13  Q.    There was a black bag in that car that was yours, correct?

14  A.    There was a black backpack-type thing, yes; but I never

15  carried -- I never, like, carried it as a purse.

16  Q.    Was the gun in the black bag?

17  A.    No, it was not, ever.

18  Q.    First time I heard that.  You mentioned he bought a ring,

19  and you don't know who it was for?  You were wearing the ring.

20  You wore it for a while, didn't you?

21  A.    I never wore the ring.

22  Q.    Actually, I'm sorry.  No.  That's my fault.  You didn't

23  wear it because it didn't fit, correct?

24  A.    Correct.

25  Q.    And y'all took it -- you and him drove to Van Atkins,

1    correct?

2    A.    I did not go with him, no.

3    Q.    Okay.  That's not what you told Agent Niedzwecki.  You

4    told him that y'all went to Van Atkins to have the ring

5    resized, and y'all were going back to pick it up the day that

6    Bob Dickerson was shot.  You remember saying that?

7    A.    No, I do not.

8    Q.    Do you remember saying that Carlstrom bought you a ring?

9    Let that focus.  There we go.  Why would he come up with this?

10   "Carlstrom bought Cook a ring from Walmart in Memphis and black

11   Nike shoes."  Does that refresh your memory?

12   A.    But I -- now it does.  I -- I -- I don't -- I don't

13   remember saying that.

14   Q.    Okay.  Well, let's --

15   A.    Because I just was in a gun battle basically, and I was in

16   shock.  Like, I didn't know what I was thinking, what was going

17   on, nothing.

18   Q.    Did you make it up?

19   A.    No.  I guess.  It's there.  It says I said it, so.

20   Q.    What about the previous sentence, "Carlstrom bought

21   numerous items using the money he had robbed from Caveman"?

22   A.    I remember saying that, yes.

23   Q.    Okay.  And that's what happened, right?

24   A.    Yes.

25   Q.    Y'all went out to Mexican one night with William and he --

COOK - CROSS

 1  Carlstrom bought the whole thing that night, didn't he?

 2  A.   I remember going out to eat, yes.

 3  Q.   And then, also, you were asked if you traveled willingly;

 4  and you said yes.  Carlstrom knew what he had done was wrong,

 5  and he was going to get caught at some point.  (Inaudible).

 6  Cook thought Carlstrom would be caught at some point.  Said

 7  that she knew she should not have done this.

 8       You knew you should not have done this.  That's not what

 9  I'm hearing from you today.  It's everybody else's fault.  Are

10  you knowingly and voluntarily -- did you commit these crimes?

11  A.   No, I did not.

12  Q.   You did not commit these crimes?

13  A.   No.  I didn't shoot anybody.

14  Q.   That's not what I said.  I said did you knowingly and

15  voluntarily aid and abet a felon in possession of a firearm?

16  A.   Oh.  Yeah.  I guess.  If it was in my car, yeah, I did.

17  Q.   And did you accessorize him after the fact, or be an

18  accessory after the fact, of the murder of James Sartorelli?

19  A.   Yes.  But I wasn't going to argue and tell him I wasn't

20  going to go with him because I was scared of him.

21  Q.   Okay.  So let's talk about, real quick -- almost done.

22  Let's talk about when you got pulled over by the Mississippi

23  Highway Patrol.

24  A.   Okay.

25  Q.   Why didn't they arrest Hunter Carlstrom?

1   A.    I don't know.

2   Q.    Why not?

3   A.    They never -- they didn't -- as far as I can remember, I

4   don't think they -- they asked for his name.

5   Q.    Exactly.  Exactly.  It's because you helped him, because

6   you were driving.

7   A.    How did I help him if they didn't ask for his name?

8   Q.    If he was driving, they would have seen the warrant.  And

9   nobody would have gotten shot.  Do you understand that?

10  A.    If he was driving, then -- wait.  Say that again.

11  Q.    If you weren't driving, if he was by himself in the car --

12  A.    Okay.

13  Q.    -- he would have gotten arrested.

14  A.    Okay.

15  Q.    Just like the hotel room.  Do you not understand that you

16  helped him?

17  A.    I -- okay.

18  Q.    We wouldn't be here today because he'd be in jail, and

19  nobody would have gotten shot.

20          MR. MCGEE:  No further questions.

21          THE COURT:  All right.  You may step down.  We're

22  going to take a 15-minute recess.  The Court will be in recess.

23  (Recess at 2:50 p.m. until 3:07 p.m.)

24      (CALL TO ORDER OF THE COURT)

25          THE COURT:  All right.  I suppose Dr. Paret is your

1  next witness?

2           MR. PARK:  Your Honor, I call Dr. Alexander Paret by

3  video.

4           THE COURT:  All right.

5       (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

6           THE COURTROOM DEPUTY:  Please state and spell your

7  first and last name for the record.

8           THE DEFENDANT:  Alexander Jason Paret, P-a-r-e-t.

9           MR. PARK:  May I proceed?

10          THE COURT:  Yes.

11  ALEXANDER JASON PARET, Ph.D., DEFENDANT'S VIDEO WITNESS, SWORN

12                      DIRECT EXAMINATION

13  BY MR. PARK:

14  Q.    Dr. Paret, are you aware that the Court has accepted you

15  as an expert witness?

16  A.    Yes, I am.  Thank you.

17  Q.    Okay.  And what is -- what is your area of practice?

18  A.    I'm a clinical and forensic psychologist.

19  Q.    Okay.  And how long have you been doing this?

20  A.    I've been doing this -- I've been doing clinical work for

21  over 25 years.  And I've been doing forensic work for

22  approximately -- around 12 to 13 years.

23  Q.    Okay.  Have you worked both in federal and state court?

24  A.    Yes, I have.

25  Q.    Okay.  Let's talk about your experience in particular with

1  domestic violence issues and arrests.  And, based on your

2  observations from the hearing today, what can you -- what can

3  you tell the Court about the situation with Ms. Cook?

4  A.    So my training in clinical practice has actually been

5  where I have actually had the ability to not only witness

6  individuals who have experienced trauma, such as Ms. Cook, more

7  specifically, in the BOP facilities, Federal Correctional

8  Institution in Dublin, California, where I was asked to colead

9  a group of individuals, Spanish-speaking individuals, who

10 specifically fit the syndrome of battered women syndrome.

11       I was the one in charge of creating the questions to

12 insure that those individuals met the criteria necessary to fit

13 the symptomatology having post-traumatic stress disorder, a

14 subcategory of that, within the construct of the individuals

15 who were applying to be a part of this group.

16       Within that, we selected 20 individuals from the prison

17 that were being detained that fit all those very specific

18 qualities and criteria of an individual who had experienced

19 battered women syndrome.

20       This group went on for nine months.  We met twice a week

21 for two hours each time identifying their issues, their level

22 of trauma and, also, allowing them to see for themselves,

23 perhaps for the first time, that the trauma they experienced

24 was a cycle, a cycle of abuse, that is, in essence, an element

25 of learned helplessness.

1        By them having to be able to identify that they themselves

2    were in a cycle of abuse, they begin to see that the trauma

3    that they experienced wasn't necessarily something that they

4    could control.

5        In this particular group, what we did was also something

6    called psychodrama, where the individual who has experienced

7    the actual abuse selects individuals from that group to reenact

8    one of the worst types of abuses that they ever experienced.

9        By that person acting as a director to their trauma,

10   they're able to first time see for themselves what they

11   actually experienced.  It's a very cathartic and very difficult

12   experience for them to be able to see firsthand what they were

13   not able to see themselves during the time that they were part

14   of this cycle of abuse.

15       In addition to that, I spent an hour or so per week with

16   the individuals that were part of the group being able to work

17   through the level of trauma that they had experienced or what

18   that level of psychodrama had done to them because it was very

19   intense and very difficult for them to be able to take.

20       That was the first type of experience that I had where I

21   became very much involved with individuals who experienced

22   PTSD, who experienced levels of battered women's syndrome.

23       And both in the forensic world and also in my clinical

24   world, the idea of being able to properly diagnosis PTSD is

25   very important.  In the forensic world, I have done well over

1    4500 evaluations.  At least, at least, a third of those include

2    the proper diagnosis of post-traumatic stress disorder.

3         In addition to that, I have provided therapy in a clinical

4    sense on a one-on-one individual basis for approximately 200

5    individuals who fit the PTSD diagnosis.  Of those who fit that

6    diagnosis, a handful fit very specific types of syndromes such

7    as what I've been explaining.  In fact, at this time,

8    currently, I am working with someone who falls under the

9    specific guidelines and criteria to fit battered women's

10   syndrome.

11        That, to me, is very specific and very important type of

12   information that I'm able to provide to the Court as far as my

13   knowledge and experience and training about what an

14   individual -- what do they experience; what are their issues as

15   far as how do they see themselves within this type of syndrome.

16   Why are they unable to leave the relationship?  And, if they

17   do, why do they oftentimes come back to it.

18        And that is an element of fear.  Fear is a driving force

19   of what these types of relationships are consistent of.  There

20   are three phases, ultimately, that apply very specifically to

21   an individual.

22        The first stage is basically, oftentimes, just verbal,

23   emotional, and physical.  Then it intensifies to the second

24   degree, which is extreme forms of that.  And, ultimately, at

25   the end, the cycle begins itself again by a courtship.

1          They talk of a honeymoon phase where that person moves

2     them -- somehow insures them that they love them.  And that

3     person stays in that relationship without being able to exit

4     it.  That is what constitutes this type of syndrome.

5     Q.     Okay.  What is PTSD?

6     A.     PTSD is a known type of diagnosis that is understood in

7     the DSM.  And it's a diagnosis that falls very specifically on

8     an individual who has been traumatized.  There are multiple

9     steps in regards to the type of criteria that needs to be

10    followed.  They reexperience the trauma.  And then, ultimately,

11    after they reexperience the trauma, how avoidant are they of

12    the trauma?

13         And, thirdly, the criteria that follows, how (inaudible)

14    or (inaudible) are they of their surrounding or elements of the

15    triggering element of what that trauma was.  That is what

16    constitutes those type of criteria for that type of diagnosis.

17    Q.     And how does that apply to Ms. Cook in your experience

18    with her and what you heard today?

19    A.     My report was specific to finding out does she actually

20    fit the diagnosis of PTSD.  Even though she was already

21    diagnosed with PTSD, I wanted to confirm that.  And she fits it

22    specifically without any sort of a doubt; that she is, without

23    a doubt, 100 percent certainty, that she fits this type of

24    diagnosis.

25         Not only was it confirmed in my clinical practice, my

1  experience with individuals such as her, in addition to the

2  fact that we did testing that confirms that she fits this

3  diagnosis without any concern.

4  Q.    Okay.  And is this something that would have been a result

5  of the death of Hunter Carlstrom, or how did it begin with Ms.

6  Cook?

7  A.    Ms. Cook actually had PTSD well before she met

8  Mr. Carlstrom.  She was in a type of environment through

9  childhood that was very abusive.  It constituted of seeing not

10 only her but her siblings be abused by her stepfather.

11       And that level of trauma and that level of invalidation

12 from those loved ones, such as her mother, to accept that that

13 actually was occurring, actually was somehow taken out of that

14 environment without any sort of processing, and put into

15 another environment where her grandparents took care of her.

16       And, so, it never was worked through.  She never received

17 the right type of support and therapy that she should have

18 received knowing that that was actually occurring.  And, so,

19 she fit the criteria of PTSD well before she ever met

20 Mr. Carlstrom.

21       Then you add what occurred, the level of abuse.  The level

22 of traumatization that she experienced began to not only

23 somehow mirror her experience but exacerbate it, the level of

24 post-traumatic stress disorder.  It became chronic.  And PTSD

25 oftentimes -- their criteria, oftentimes, makes an individual

1    numb and unable to function.  That is one of the

2    symptomatologies of someone that has experienced extreme

3    trauma.

4         And those traumas, oftentimes, are triggered.  They can

5    lead to flashbacks or nightmares, which Ms. Cook has expressed

6    and, in the interview itself, was able to provide all the

7    necessary criteria that, again, confirmed her level of, in

8    essence, inability to function while she is in a state of

9    complete traumatization.

10   Q.   I guess the simple question would be why didn't she just

11   leave Hunter Carlstrom when he first became abusive, or why did

12   she keep going back?

13   A.   My opinion regarding that, which, again, is part of my own

14   training, my own experience with individuals that have fit that

15   criteria, is that they physically are unable to leave because

16   of the fear that has been instilled in them.

17        That fear is, oftentimes, through the beginning stages,

18   the courtship of I love you; I hate you; I will kill you if you

19   leave or if you tell anyone; or I will actually harm other

20   family members.  That continues, and they become isolated.

21   Their social network begins to actually decrease rather than

22   increase.

23        And that is all part of the cycle of abuse where that

24   individual begins to have more and more control over the person

25   who's being victimized.  And they have less control over doing

1   anything that they want to do.  Therefore, they are more

2   helpless rather than empowered by the relationship itself.

3   Q.    Okay.  And you may have touched on this a little bit.  But

4   why would Ms. Cook continue going back?  I mean, I understand

5   what you're saying about the level of fear that she had.  But

6   it -- but, in essence, why was she unable just to detach

7   herself from Hunter Carlstrom; and why did she keep going back

8   to him?

9   A.    She kept going back for several reasons.  One of them is

10  that she actually -- when he would apologize and say that he

11  loved her, that she would believe that.  Because she is an

12  individual who believes that they can actually change the

13  person.  That's part of the criteria of someone who has been

14  abused.

15        They actually believe that if they actually try to help

16  them that they're going to start showing more of the qualities

17  that they like, such as the fact that they can actually be

18  nice, the fact that they can actually be able to share with

19  them good moments; or, in fact, they are able to purchase

20  things for them that they love.  Those are some of the reasons

21  that she would go back to it.

22        The other one is a threat.  If Mr. Carlstrom threatens her

23  or threatened her that he would actually harm her family

24  members if she did not return to him, that, in essence, is what

25  would occur and what would trigger her to go back to him.

PARET - DIRECT

1       Again, it didn't -- it's an element of fear.  It's an

2  element of someone trying to manipulate her.  And it actually

3  has occurred where they begin to ultimately disassemble who

4  they are as an individual without having the ability to have a

5  say.  And the more they continue to do that, that person is

6  more and more dependent on that person for survival.

7  Q.   How severe would you say Ms. Cook's PTSD is?

8  A.   It's chronic and it's severe.

9  Q.   Okay.  How does it compare to other cases that you've

10 dealt with?

11 A.   I would say that she falls -- again, specifically, not

12 only does she have PTSD; but she actually falls under the

13 sub-criterion of battered women's syndrome.  So I would say

14 that she is an individual that has experienced significant

15 trauma such as what we obviously have heard today in court.

16 And it mirrors the type of trauma of the individuals that I

17 have helped.  And I think that she would fall within the 5

18 percent of extreme of those individuals who I've worked with.

19 Q.   How would her level of trauma affect her actions when

20 she's under duress?

21 A.   Her level of action would be one which is analogous to an

22 actual experiment that was done at one point where there are

23 two sides to a piece of floor.  One side, there's

24 electrocution.  On the other side, there's no electrocution.

25 In the middle, there's a barrier, enough for the dog to be able

1   to jump from one side to the other.

2          When one side of that floor is electrocuted, the dog jumps

3   to the other side to avoid electrocution.  When the other side

4   is electrocuted, the dog jumps to the other side to avoid

5   electrocution.

6          When you do this enough, the dog begins to learn that they

7   can go and avoid the trauma that they don't like.  But what

8   happens when both sides are electrocuted?  The dog jumps on one

9   end but doesn't jump back.  Why doesn't the dog jump back?

10  Because it's learned that they're helpless, and they stay there

11  being electrocuted.  That is the analogy that I would give for

12  Ms. Cook.

13  Q.    Okay.  During that time, under that level of trauma, was

14  she capable of thinking rationally?

15  A.    Was she able to think rationally?  Was that the question?

16  Q.    Yes.

17  A.    No.

18  Q.    And why would you say that?

19  A.    She is unable to think rationally because she does not

20  have control, not only of her physical well-being but of her

21  own mental well-being.  And, when you strip that, you lose

22  rationality.

23  Q.    Okay.  We've heard testimony about the TikTok videos and

24  about the -- seen photographs of them in what looks to be a

25  consensual relationship and a loving relationship.  And how

1  does that fit in with Ms. Cook's diagnosis?

2  A.    I think it fits perfectly within the third stage of this

3  syndrome when the individual who is victimizing somehow finds a

4  way to -- to -- to somehow show affection, show love, show that

5  they are nucleus and somehow reengages the syndrome, the stage

6  once again.

7        And, so, it is very common to see those type of somehow

8  make-believe incidences, or the person would actually believe

9  that there really is something special there.  And that would

10 be Mr. Hunter.

11 Q.    It's been noted that Ms. Cook did not advise law

12 enforcement officers that Hunter Carlstrom was dangerous and

13 armed.  And what would you say about her level of fear in

14 regard to him?

15 A.    Well, I just heard her own testimony.  And why didn't she

16 say to, perhaps, the officer that stopped her when she was

17 speeding that she -- that he had guns?  Well, the reason why I

18 believe she didn't say anything is because if she said anything

19 and the officer did not take some sort of action to arrest him,

20 she would be in tremendous danger knowing what it is he had

21 done, which is he actually killed someone.

22            MR. MCGEE:  Your Honor --

23            THE WITNESS:  There are guns --

24            MR. MCGEE:  -- object.  This is pure speculation.  He

25 asked a specific question, why didn't she say something when

PARET - DIRECT

1  she was pulled out of the car; or why didn't she say something

2  when she was pulled over.  He has no idea why she didn't say

3  something.  That's impossible.

4           THE WITNESS:  She was deeply afraid; that's why she

5  didn't say anything.

6           THE COURT:  All right.  The Court will -- overruled.

7       Go ahead.

8           MR. PARK:  Thank you, Your Honor.

9  BY MR. PARK:

10 Q.   In terms of Ms. Cook's future, what does she need to

11 address the PTSD?

12 A.   Okay.  Can you repeat the question, please?

13 Q.   What would be the prognosis for Ms. Cook in the future?

14 Is this something that she can overcome?

15 A.   Yes.  She is able to overcome that if she gets specific

16 types of therapy specific to, for instance, cognitive behavior

17 therapy, which is something that I use routinely in the type of

18 work that I do, being able to identify the illogical thoughts,

19 how those illogical thoughts create the emotion which

20 ultimately creates the behavior.

21      Once we're able to somehow reprocess and rework those

22 types of negative thoughts about themselves, then we can begin

23 to change and modify their behaviors in the future.

24 Q.   What would be your assessment of the likelihood of her

25 being involved in some type of violence in the future?

1  A.    I already performed a very specific test to be able to

2  find out what level of dangerousness she possesses.  And the

3  end result is she's at a very low percentile or very low, in

4  essence, prognosis for dangerousness, which then falls under

5  that criteria is she dangerous?  No.  And then is she likely to

6  reoffend?  And the answer would be no.

7  Q.    Okay.  Does she suffer from any type of psychosis?

8  A.    No.

9  Q.    Any issues about being bipolar or depressed?

10  A.    Yes.  She falls under the diagnosis of major depressive

11  disorder, which was not only confirmed through the work that I

12  did with her and the evaluation itself but the fact that she

13  actually was diagnosed previously and has been on medication

14  for that.  In addition to that, she also falls under the

15  generalized anxiety disorder, which she's actually been

16  medicated for as well.

17  Q.    Okay.  In terms of her actions, as you're aware, there was

18  not a defense of insanity that was raised or a defense of

19  duress at trial; but it -- in terms -- and you and I have

20  talked about the Federal Sentencing Guidelines before.  Do you

21  believe that duress played a role in the actions of Ms. Cook?

22  A.    Yes.

23  Q.    Okay.  And what role would be that be?

24  A.    Well, she's in a constant state of duress.  That was her

25  life.  That's what she experienced in that relationship.  It

PARET - DIRECT

1    ebbed and flowed.  It was intoxicating at points where she

2    wanted more of the good.

3         And, when she got the good, she actually was somehow

4    sideswiped and got the bad and got the real bad.  And, during

5    the real bad stages, there were threats and physical abuse and

6    emotional abuse.  And she was more into that level of cycling

7    that she could not get out of.

8    Q.   And how did that affect the voluntariness of her actions?

9    A.   It -- it's completely involuntary.  She is not acting in a

10   voluntary way.  She's only acting as a way to safeguard herself

11   and that of her family members who she loves.

12   Q.   Did this duress, or the PTSD -- did it affect her ability

13   to think rationally?

14   A.   Yes.

15   Q.   Doctor, I'm going to wind it up a bit; but can you tell us

16   what are your conclusions in regards to Ms. Cook and her

17   actions in regards to these criminal charges?

18   A.   Well, I would like to use an actual case, one that I

19   experienced, to be able to answer that question.  How

20   involuntary were her actions?  That's really the question here.

21   Did she actually act involuntarily, or did she act voluntarily?

22        And what I would like to share with the Court is an actual

23   potential individual who I evaluated during those groups that I

24   did where that person that was so abusive to her, to her, that

25   person, convinced her that her own son was a dog and convinced

1  her that that -- that son, who was a dog, had to live outside

2  and had to be fed in a dog bowl.  And she did that because she

3  feared him.

4      Now, I ask, did she do that voluntarily or involuntarily?

5  And that is akin to what Ms. Cook was doing, involuntarily

6  doing something because she was so afraid something else would

7  happen.  That's the level of complete disconnect and

8  irrationality that someone can actually come through and become

9  to do some things involuntarily to their own son.

10  Q.   Doctor, you've provided a copy of your CV, your curriculum

11  vita, that's approximately 10 pages in length.  Are you

12  familiar with that?

13  A.   Yes.

14  Q.   And you've also prepared a -- roughly a 39-page report

15  that also had exhibits attached to it.  Are you familiar with

16  both of those documents?

17  A.   I am.

18       MR. PARK:  Your Honor, I'd like to offer both his CV

19  and his report into evidence.

20       THE COURT:  Very well.

21       MR. MCGEE:  No objection.

22  (EXHIBIT NOS. D-3 AND D-4 WERE RECEIVED INTO EVIDENCE)

23       MR. PARK:  I'll tender the witness.

24       THE COURT:  The Government may cross-examine.

25                    CROSS-EXAMINATION

1  BY MR. MCGEE:

2  Q.    Dr. Paret, my name is Clyde McGee.  I'm with the U.S.

3  Attorney's office.  How are you?

4  A.    Good afternoon, Mr. McGee.  How are you?

5  Q.    I'm doing well.  You were hired in this case basically to

6  keep Ms. Cook out of jail, correct?  Is that fair to say?

7  A.    Was I hired to keep Ms. Cook out of jail?  Was that your

8  question?

9  Q.    That's my question, yes, sir.

10 A.    No.

11 Q.    Okay.  Well, from looking at the informed consent

12 contract -- this is on page 1 of the Bates documents I sent you

13 previously, Bates No. 1.

14 A.    Yes.

15 Q.    It says, "The forensic mental evaluation is being

16 conducted for the specific purpose of mitigation of

17 sentencing."  I actually can't read the last word.  What does

18 that last word say?

19 A.    Mitigation of sentencing, I believe.  I can't read it

20 either.

21 Q.    Okay.  So you've been hired to mitigate or lower her

22 sentence, correct?

23 A.    Yes.  But that wasn't the question you asked me.

24 Q.    Okay.  Fair enough.  Fair enough.  Let me ask you this,

25 have you testified -- have you testified as an expert before

1  regarding PTSD?

2  A.    I've been asked to testify about an individual, which you

3  created and sent an actual case law of, that I had not in any

4  way evaluated.  And, therefore, my testimony was not allowed.

5  Q.    Okay.  I'll -- I'll talk about that in a moment.  Hold

6  that thought.  Just -- I'm just making sure here that we're

7  clear.  Because I'm looking at your CV.  You've got a list of

8  things that you're a court-appointed expert witness in, that

9  you've testified in the following areas of expertise.  And then

10 you say other areas of expertise.  And one of those is

11 post-traumatic stress disorder, correct?

12 A.    That is correct.

13 Q.    So you have never been accepted as an expert in PTSD in a

14 court of law.  Is that correct?

15 A.    That has never been the actual -- that has never been what

16 I've been qualified to be.  That was a question that was asked

17 while I was already qualified to answer other questions that

18 was not -- that were not related to that.  It was for

19 competency-related issues.

20 Q.    I'm going to try to ask it more clearly.  Have you ever

21 been offered and accepted by a court of law as an expert in

22 post-traumatic stress disorder, yes or no?

23 A.    No.  That has never been something that I needed to do.

24 Q.    So this is your first time?

25 A.    My first time to --

1  Q.    Be -- be an expert in --

2  A.    -- talk about PTSD?

3  Q.    I'm sorry.  Repeat that last part.  I didn't mean to

4  interrupt you.

5  A.    To talk about PTSD?

6  Q.    To be an expert in PTSD.

7  A.    I've been an expert and talked about PTSD in multiple

8  cases.

9  Q.    But not in court, correct?

10 A.    In court, state and federal.

11 Q.    Okay.  I'm going to move on.  But you answered earlier --

12 and I think this is accurate -- that you have never been

13 offered and accepted by a court as an expert in post-traumatic

14 stress disorder, right?

15 A.    Your question is misleading because I've explained to you

16 that I was already appointed as an expert in competency, and

17 then the question of PTSD was brought into it.

18 Q.    Okay.  I'll move on.  Now, I want to touch on this too.

19 You mentioned, when you were talking about dangerousness -- you

20 definitively said Ms. Cook has no psychosis, correct?

21 A.    That's correct.

22 Q.    Why didn't you perform any psychopathy scale tests; why

23 didn't -- why didn't you do that?

24 A.    I did.

25 Q.    Which one?

1    A.    The personality assessment instrument.

2    Q.    I couldn't hear you; what did you say?

3    A.    The personality assessment instrument.

4    Q.    Okay.  So that tells whether somebody has psychopathy?

5    A.    Has psychosis.

6    Q.    Psychosis, yes.  Yes or no?

7    A.    Yes.

8    Q.    Okay.  That's the first time I've heard that.  What

9    about did you review, did you review, any medical records of

10   Ms. Cook before, before, August of 2020?

11   A.    No.  They don't exist.  I didn't have any.

12   Q.    Don't you think that would be important?

13   A.    If they existed.  If they existed, absolutely.

14   Q.    Did you ask for them?  Did you make her fill out a HIPAA

15   consent and send it to multiple hospitals or anything?

16   A.    Nope.  I spoke to Mr. Park; and I asked I want every

17   single record that exists on Ms. Cook, that's what I asked,

18   including medical records.

19   Q.    Okay.  We'll get to that in a second.  But wouldn't you

20   agree with me that you have not reviewed any medical records

21   prior to August 2020?

22   A.    That's correct.

23   Q.    Okay.  Isn't it fair to say that the more you know about

24   an individual that you are interviewing the better and more

25   thorough the evaluation would be?

1  A.    Unfortunately, sometimes we cannot get everything that we

2  want.

3  Q.    That's not what I asked.  Isn't it fair to say that the

4  more information you know about the individual the better and

5  more thorough the evaluation would be, yes or no?

6  A.    I wouldn't say it would be more thorough.  It would be

7  better.

8  Q.    Okay.  Wouldn't it be important to go back and see how the

9  defendant acted on a certain day, maybe talked to people

10  during -- that knew her during that time period?  That's

11  important, right?

12  A.    I did.

13  Q.    Okay.  Yeah.  We'll get to that too in a second.

14  A.    Okay.

15  Q.    Did you talk to anybody in Mississippi?

16  A.    Did I speak to anyone in who?

17  Q.    Mississippi?

18  A.    No.  I did not.

19  Q.    Speak to anybody in Arkansas?

20  A.    I only spoke to her grandparents.

21  Q.    Okay.  How many interviews did you have with Ms. Cook?

22  A.    Two.

23  Q.    How long were they?

24  A.    I would have to go back.  I think they were approximately

25  3 hours, 4 hours apiece.  I would have to go back and look.

1  Q.    I think it was 6 hours total from what you wrote.  And

2  over Zoom, right?  You met with her -- you didn't meet with her

3  in person, did you?

4  A.    I did not.

5  Q.    As a forensic psychologist, aren't you trained, and isn't

6  it your duty, to corroborate things that a client just states?

7  A.    Is it my duty to corroborate things that the client

8  states?

9  Q.    Correct.

10  A.    Yes.

11  Q.    You got to, right?

12  A.    It's important to do.  I don't have to, but it's important

13  to do.

14  Q.    Will you repeat that?  I didn't hear you.

15  A.    It's important to do.

16  Q.    I think so too.  So let's look at your report.  You're

17  probably very, very familiar with it.  But it's page 80; it's

18  the Bates number page 80.

19          THE WITNESS:  Your Honor, is it okay if I review the

20  record, my -- my -- my report?

21          THE COURT:  You may.

22          THE WITNESS:  Thank you.

23  BY MR. MCGEE:

24  Q.    Notice I'm reading from your report.  Page 80's actually 3

25  of 39 of your report; my Bates No. 80.  "The following report

1 and opinions are based upon information made available to the

2 examiner at the time of the evaluation.  Unless specifically

3 noted, there has not been a systematic effort made to

4 substantiate the full accuracy of all the information provided

5 in this report.

6      "The report is based on the assumption that the

7 information provided is reasonably accurate unless noted to the

8 contrary.  The psychologist reserves the right to modify

9 opinions or conclusions if additional information relevant to

10 the findings is provided at a later date."  So that's -- that's

11 kind of your disclaimer, right?

12 A.    Yes.  I'm able to modify my opinions if more information

13 is provided.

14 Q.    So you would agree the more information used the more

15 accurate you can corroborate things -- in other words, you can

16 find out if the person that you've interviewed for 6 hours is

17 telling the truth, correct?

18 A.    I would be able to corroborate if they were not analogous

19 to what she's saying, yes, that is correct.

20 Q.    That's correct.  And, so, if they're not corroborated,

21 then, basically, we're dealing with an uncorroborated set -- or

22 interview or set of opinions, correct?

23 A.    I think that, if you're trying to put words into my mouth,

24 I would say that the more information I have the more I'd be

25 able to see what it is that she said that actually falls to

1   what it is I know and perhaps why it is that she said something

2   that does not fit.  And then I can make opinions on that.

3   Q.    Correct.  So tell the Court who all you interviewed.

4   A.    I evaluated both of her grandparents.

5   Q.    Say that again?

6   A.    I evaluate -- sorry.  I interviewed both of her

7   grandparents.

8   Q.    Both of her grandparents.  Okay.  So do you commonly

9   just -- just interview a couple of people who are related to

10   her?  Is that -- is that common?

11   A.    So your question is, is it common to interview people

12   that --

13   Q.    Only family members?

14   A.    Well, I believe that that was what I was asked to do.

15   When I asked -- I wanted to evaluate collateral sources,

16   Mr. Park said I would like for you to go ahead and speak to her

17   grandparents.

18   Q.    Did you ask him to interview any other people involved in

19   this case?

20   A.    I don't believe I did.

21   Q.    Okay.  But you got to admit the more people you interview

22   that's more -- that corroborates the information more, correct;

23   and it makes your report more accurate, right?

24   A.    Well, if I start evaluating everyone, then I don't know

25   how long the report could be; and I may have some sort of a big

 1  conglomeration of information.  I may not know what to even do

 2  with it.

 3  Q.    For example, wouldn't it be -- wouldn't it be wise --

 4  A.    So, to answer your question -- to answer your question, I

 5  get to choose who I want to be able to interview that is going

 6  to be able to provide me with information to be able to

 7  corroborate whatever it is that's being asked.

 8  Q.    Okay.  So wouldn't it be wise or prudent to interview

 9  people who interacted with them regularly during the criminal

10  part of the incident or during your post-traumatic stress

11  disorder period, as you said?

12  A.    It would have been very good information --

13  Q.    Are you aware --

14  A.    -- to be able to have that.  I don't know how

15  (inaudible) --

16           THE COURT:  Let him (inaudible) --

17           THE WITNESS:  -- (inaudible) I would have been able

18  to provide information on.

19  BY MR. MCGEE:

20  Q.    I apologize for interrupting.

21  A.    I'm -- I'm trying to answer your question, and you're

22  asking me other questions.  Is it okay to just ask me one

23  question, and let me answer that; and then we can go forward

24  from there?

25  Q.    Certainly.

1  A.    Is it all right to do that?  Because I can't answer a

2  question when you ask me another question because I'm actually

3  sharing that information from the first question.

4  Q.    I understand.  I apologize.

5  A.    Thank you.

6  Q.    So what I asked was, wouldn't it be valuable to interview

7  people who were regularly with them during their time in

8  Arkansas and Mississippi or, essentially, the criminal part of

9  this case?

10  A.    Yes.  That would have been a valuable part of information,

11  yes.

12  Q.    Yeah.  Because I was really confused.  One of your

13  conclusions says Ms. Cook's involvement as an accomplice to the

14  incident offense on the day in question was involuntary and

15  initiated by feelings of intense isolation and dependency on an

16  individual that repeatedly betrayed her trust and abused her to

17  breakdown her willpower.

18        And the emphasis there is "on the day in question."  Do

19  you realize that the criminal part of this was 11 days -- there

20  was a murder and then -- I'm not done yet.  There was a murder,

21  and then there was activity of fleeing throughout.  And then,

22  finally, the day where he was shot; and she was arrested.  So

23  you said "on the day in question."

24  A.    Yeah.  I read your memo, sir; and you bring that up.  And

25  I have a very specific way of being able to answer that.  I

1  could have said *days*, and probably that would have been more

2  prudent.

3  Q.    Now, let's go back.  We talked about you being excluded

4  from multiple courts, correct?

5  A.    Go ahead.  Let's talk about it.

6  Q.    Okay.  I'm talking about the *Branch* case.  You were trying

7  to offer an opinion on PTSD, and then you admit you never even

8  had interviewed.  This was a victim who had been shot, correct?

9  A.    I never evaluated *Branch;* nor did I ever evaluate anyone,

10  for that matter.

11  Q.    And you were excluded, correct?

12  A.    Again, I never evaluated *Branch;* nor did I ever evaluate

13  the person that I needed to make the comments on PTSD.

14  Correct.

15  Q.    Okay.  Let's talk about the *Ochoa* case, O-c-h-o-a.  You

16  tried to be an expert on a child interviewing technique that

17  you had never used; and you got excluded, didn't you?

18  A.    You want me to explain what that is all about in a way

19  that is very clear to the Court?

20  Q.    You certainly may.

21  A.    Very well.  That particular case was very specific to

22  competency.  Then I was asked by the defense if I could comment

23  on the (inaudible).  I indicated that I had had a lot of

24  training in cognitive interviewing from 1998 through 2002.

25       I then volunteered that the type of -- the type of -- the

1   interviews that had been done for the cornerstone had other

2   steps within it that I did not have training in. And, since I

3   had not done any sort of training since 2002, I would not feel

4   comfortable in offering an opinion regarding that. And that is

5   what was said, and that's what was paraphrased by the Court.

6   Q.   Okay. Fair enough.

7   A.   So, therefore, I was never asked to provide an opinion

8   because I said I could not provide an opinion.

9   Q.   I think you were asked, because the Court said you were

10   not qualified to offer expert testimony on the cornerhouse

11   interview technique. I think that's what happened. Okay. Let

12   me ask you --

13   A.   What happened was I was asked; and I could not provide it

14   because I had not done the training, only review of records,

15   for instance; or only the fact that I had continued to read

16   articles. But that doesn't provide the necessary training,

17   which is what was indicated. If you continue to read the

18   article, the case law, that's basically what it says, instead

19   of cherry-picking what it is you want to bring up.

20   Q.   Okay. Well, I'm about to cherry-pick again; and you

21   probably know what's coming.

22   A.   Okay.

23   Q.   *State of New Mexico v. Randall Eugene Cook*.

24   A.   Thank you very much for asking that.

25   Q.   So -- I haven't asked the question. Okay? I've just told

1   you what I was about to say.  Okay?  So this is *United States*

2   *v. Cook*.  You were the sole witness in a competency hearing for

3   the defense where you said the defendant was not competent.

4        And what did the Government do -- or the State?  They

5   played a jail call, a jail call, of the defendant, did not even

6   call an expert.  And you stood by your guns and still said that

7   he is incompetent, didn't you?

8   A.   So did you know there were actually eight other phone

9   calls that I actually got the chance to review, and he

10  cherry-picked that one to insure that he could get that in?

11  But what the other eight phone calls said is that he was highly

12  delusional and disorganized.

13       And I stuck to my guns because he was not competent when I

14  evaluated him.  I mean, incompetency is state specific.  When I

15  evaluated him, he was not competent.  And, when I heard that

16  particular phone call, which I did, and the others were not

17  included, I still say that he is incompetent because that is

18  how I witnessed him.

19       And that phone call, if you continue to read, is very

20  illogical and irrational because he thinks if he's crazy all of

21  his charges are going to be dismissed.  Do you think that's

22  someone that's competent?

23  Q.   Let's see what the district court said.

24  A.   I know what they said.

25  Q.   Quite bluntly, I can't -- excuse me.  Quite bluntly, I

1 can't believe that Dr. Paret held his opinion after listening

2 to that recording.  Regardless, it is my finding that based on

3 the evidence the defendant is competent to stand trial.  And

4 that was affirmed by the -- looking for it here.  It's going to

5 be the Court of Appeals of New Mexico.

6 A. Yes.  That was Judge Thompson.  And, guess what, today I

7 still stand by what I said.

8 Q. Sounds good.  Now, let's go back and talk about -- this is

9 actually really important.  Let's talk about the -- what you

10 reviewed, okay, what you reviewed to also corroborate what

11 Ms. Cook said, what you reviewed.  Okay?  This is page Bates

12 No. 80 of your report, page 3 of 39.  Okay.  So I've got

13 here --

14 A. Sir -- sir, you keep saying 3 of 89.  It's actually 39,

15 correct?

16 Q. Three of 39, correct.  This is page 80 Bates number.  So

17 you reviewed -- and I'm going to ask you -- I'm going to list

18 out some things, and I want you to either agree or disagree

19 with me -- her statement to the FBI and the Mississippi Bureau

20 of Investigation, the Illinois domestic violence complaint,

21 medical records after she was released on supervision, some

22 text messages submitted from her family, scanned the witness

23 statements where local Arkansas detective interviewed Andrew

24 Capps, Kyle Pratt, Bill Carlstrom, Debbie Ferguson, Sloan

25 Durham, Jeremy Chett.  Now, sir, I'm going to ask you is that

PARET - CROSS

1  all that you reviewed?

2  A.    Now, you're saying things that I have not seen here.  Let

3  me just -- you're saying names that actually do not -- by these

4  notes -- you're saying names of officers I don't even have

5  records of as far as a record review.  Can you please go about

6  telling me where you read those?

7  Q.    Sir, I got those from your attorney who emailed me and

8  said these are the attachments of what Dr. Paret reviewed.

9  A.    Yeah.  But you're asking me what my evaluation says.  And,

10  so, you're saying one thing that does not equate to my

11  evaluation.  So how do you want me to answer that?

12  Q.    Okay.  Look, do you remember reviewing -- and I've got it

13  here if you want to look at it.  But do you remember reviewing

14  interview reports of multiple people that had been transcribed,

15  essentially?  Do you remember that?

16  A.    I recall reviewing.  I'm going to have to ask you maybe to

17  speak a little bit louder because I can't hear you, sir.

18  Q.    Okay.  I tell you what, let's do it this way.

19  A.    Okay.  Go ahead.

20  Q.    Let's do it this way.  Have you read the FBI 302 of

21  Spencer or Jaime Williams?

22  A.    I think that that was part of what you sent today at

23  around 11:00 a.m., around 300 or so pages long, to review.  Is

24  that what you're asking?

25  Q.    Yeah.  So what I'm asking you is, before you did your

PARET - CROSS

1  evaluation and you wrote this large document and you're trying

2  to corroborate information, did you look at these FBI 302s of

3  Spencer and Jaime Williams, yes or no?

4  A.   I didn't have those.  No.  I did not.

5  Q.   Okay.

6  A.   (Inaudible).

7  Q.   That was your first time to see them -- sorry.

8  A.   That was the first time that I've seen those, when you

9  sent them this morning, yes.

10 Q.   Those were -- that's who Ms. Cook and Mr. Carlstrom stayed

11 with in Mississippi for, like, five or six days?

12 A.   That's correct.

13 Q.   Pretty important.

14 A.   I read that today.  I read them.  Yes, they are important.

15 Q.   But you didn't have that when you were doing your

16 evaluation, did you?

17 A.   I did not.  That is correct.

18 Q.   What about her cell phone records?  Did you have any of

19 her cell phone records of her conduct during that time period?

20 A.   Well, you also included two TikTok videos.  And, as far as

21 what you're presenting as far as evidence, were two phone calls

22 that were done on May 9th.  So is that what you're referring

23 to?

24 Q.   So, yes, that's what I'm -- that's one thing, the TikTok

25 videos.

1   A.    Okay.

2   Q.    Had you ever seen those before you done your evaluation?

3   A.    Yes.

4   Q.    You have seen those?

5   A.    They were provided to me afterwards.

6         THE COURT:  Move on.

7         MR. MCGEE:  Okay.

8   BY MR. MCGEE:

9   Q.    So what about the pictures that I -- the pictures of them

10  two together in emojis, the hearts and whatnot; did you review

11  those?

12  A.    I just saw them, yes.

13  Q.    Did you review them before submitting your evaluation?

14  A.    I believe that's the first that I'd seen --

15  Q.    So that's --

16  A.    -- of those emojis.  Yeah, that's the first I've seen.

17  Q.    So, again, this is all evidence, evidence that could have

18  been used to corroborate or not corroborate what Ms. Cook was

19  saying, correct?

20  A.    It's information.  I don't know what -- what is it going

21  to corroborate?

22  Q.    Is it relevant information?

23  A.    There's photographs of two individuals, selfies, with

24  little hearts on them.  That's what they are.

25  Q.    Okay.  So that's not relevant.  Okay.  What about jail

1  calls?  I had 165 jail calls that I disclosed in discovery.

2  Did you listen to any of those?

3  A.    I just listened to the three that you presented today.

4  Q.    But that's all?

5  A.    That's it.

6  Q.    Could you please turn in your report to Bates No. 106,

7  please?

8  A.    I don't have a 106.  It's only 39 pages long.

9  Q.    Okay.  I'll tell you the number of your report.  Hold on.

10  It's on page -- my label No. 106; it's your page 29 of the

11  report.

12  A.    Very well.

13  Q.    I'm going to read.  It says, "Looking back at the events

14  of the last few days of their --

15  A.    Sir --

16  Q.    -- relationship --

17  A.    -- sir, sir, sir?  Could you please wait a second?

18  Q.    Sure.  I apologize.

19  A.    Thank you.  (Pause).  Okay.  Can you please tell me where

20  you are on page 29?  That way I can follow along with you.

21  Q.    Third paragraph.  I'm sorry.  I forgot you couldn't see it

22  on the ELMO.  That's my fault.  Third paragraph halfway

23  through -- or -- I'm sorry -- almost the end of the third

24  paragraph.

25  A.    Go ahead.

1 Q.     "Looking back at the events of the last few days of their

2 relationship, Ms. Cook revealed -- emphasis on revealed; that's

3 my emphasis -- she felt as though she had no choice but to

4 follow along with his plan because she didn't really know

5 anything besides being with him and lacked clarity in her

6 thinking."

7       Okay.  So that's what you said in your report, that she

8 "revealed" that.  Now, are you aware -- you're familiar with

9 your rough notes of the case, correct?

10 A.     Yes.

11 Q.     I'm looking at Bates No. 180 of what I sent you this

12 morning.

13 A.     Okay.

14 Q.     Tell me when you're there.  (Pause).  Are you there?

15 Bates No. 180, No. 17 in your rough notes.

16 A.     I'm not trying to be difficult here.  What I'm getting is

17 very small.  I'm trying to follow along the best I can.  Please

18 bear with me.  So I see 177 of yours, the Bates.  And you said

19 what number was it that you're looking for?

20 Q.     180.

21 A.     180.  Give me a second.

22          THE COURT:  I appreciate you gentlemen trying to be

23 thorough on this; but I'd like to finish this without going

24 long into tomorrow, so try to speed it up.

25          MR. MCGEE:  Yes, Your Honor.  Will do.  I'm almost

1    done.

2            THE WITNESS:  I think I'm there with you, sir.

3    Please go ahead.

4    BY MR. MCGEE:

5    Q.    Do you see where it says "How did he bring you into this

6    ordeal?"

7    A.    (Perusing document).  Okay.  I'm going to trust what you

8    say because I can't find it.  Go ahead.  I can't read it, but

9    go ahead and read it.

10   Q.    Okay.  Well, we're doing this in front of the Court and

11   everybody; so, if I say something incorrect, they'll correct

12   me.  "How did he bring you into this ordeal?"  "I don't really

13   know besides, like, being with him."  I don't know if she's

14   saying I like being with him, not sure.  It looks like a typo.

15   End quote.  Looking back, agrees she didn't have much of a

16   choice other than to do what he wanted her to.  "Yes."

17         So that's actually your question.  You said something

18   totally different in the report.  You said Ms. Cook revealed,

19   like she came up with it, that she felt though she had no

20   choice but to follow along with his plans.  You put that in her

21   head, didn't you?

22   A.    I put that in her head?

23   Q.    Thank you.

24   A.    No, no, no.  No.  No, no, no.  I'm asking you a question.

25   Q.    Yeah.

PARET - CROSS

1   A.    I put that in her head?  No.  I did not put that in her

2   head --

3   Q.    You asked her the question --

4   A.    -- not at all.  Not at all.

5   Q.    You asked her the question --

6   A.    Not at all.

7   Q.    -- that she didn't have much of a choice, and she

8   apparently said yes.  That's your notes, not mine.

9   A.    Correct.  That is a note.  And that is something that she

10  agrees to.  But that's not something being put in her head.

11  That's an agreement and corroboration with someone who is

12  battered and has experienced the syndrome and is unable to get

13  out of it.  That's what that means.

14  Q.    Sir, where are you right now?

15  A.    Where am I?  In Illinois.

16  Q.    You're in Illinois.  You're getting paid about $10,000 to

17  do this; is that right?

18  A.    No.  I got paid $10,000 to do this.  That was my

19  involvement in being able to come up with an opinion for the

20  trier of facts to be able to understand what Ms. Cook went

21  through, the level of traumatization she went through.  That's

22  what I got paid for.

23  Q.    So you're getting paid $10,000; and you can't even come

24  down here and look -- and get in front of this Judge, in front

25  of me, and in front of this marshal that got shot and testify

PARET - CROSS

1   that Ms. Cook is essentially innocent and should not be held

2   responsible for her conduct?  That's what you're doing, right?

3   A.    Mr. McGee, first of all, I do not have a vaccine because I

4   cannot have a vaccine because I have a preexisting condition

5   that does not allow me to have a vaccination.  Therefore, I

6   don't travel and have not traveled in 2 years.  Does that

7   explain why I'm not there?

8   Q.    It does explain it.  You realize, though --

9   A.    Thank you.

10  Q.    You realize, though, that a United States Marshal almost

11  lost his life in this case; and you're up here saying that she

12  was under some kind of trance and cannot be held responsible

13  for her conduct; and that she acted involuntarily even after

14  she pled guilty knowingly and voluntarily under oath.  But

15  that's still your opinion even after hearing all this other

16  stuff that you could have reviewed?

17  A.    First and foremost, I would like to say that I am terribly

18  sorry for what happened to the officer.  That should have never

19  happened, first of all.  But it happened because of a reason.

20        And you used the word *trance*.  Well, let me say something

21  to you.  These individuals who have experienced that level of

22  trauma don't have a say; and they are traumatized and almost in

23  a trance-like state to not be able to do what they willingly

24  would be able to do otherwise.  That's what I'm explaining, and

25  that's what I'm going to state for the record.

1 Q.    Fair enough.  She pled voluntarily and that she knowingly

2 and voluntarily committed these crimes?

3 A.    Involuntarily.

4           MR. MCGEE:  No further questions, Your Honor.

5           THE COURT:  All right, Doctor, you may -- you may be

6 excused.

7           THE WITNESS:  Thank you, Your Honor.

8           THE COURT:  All right.

9      Where does that bring us, Mr. Park, in your case?

10          MR. PARK:  We have no further witnesses, Your Honor.

11          THE COURT:  All right.

12     Let's look at the time element.  What does the Government

13 have to present to the Court and who and any testimony?  I'm

14 sure you said you had some testimony.

15          MR. MCGEE:  Your Honor, I think we're probably down

16 to about five minutes at the most.

17          THE COURT:  Okay.  Well, we'll continue, then.  Who

18 do you call?

19          MR. MCGEE:  Justin Niedzwecki, Your Honor.

20          THE COURT:  All right.

21          MR. MCGEE:  Your Honor, Mr. Park and I discussed

22 these exhibits.  And I may not refer to them; but, just to

23 speed things along, the Government would submit Exhibit 1A, 1B,

24 Exhibit 4, Exhibit 2, and Exhibit 5 into evidence at this time.

25          THE COURT:  All right.

1          And that's agreed to?

2                    MR. PARK:  It is, Your Honor.

3                    THE COURT:  Okay.

4                    (EXHIBIT NOS. G-1A, G-1B, G-4, G-2, AND G-5

5                         WERE MARKED AND ARE ATTACHED HERETO)

6                    THE COURT:  All right.  Come around and be sworn.

7                    (OATH ADMINISTERED BY THE COURTROOM DEPUTY)

8                    THE COURTROOM DEPUTY:  And state and spell your first

9     and last name for the record, please.

10                   THE WITNESS:  Justin Niedzwecki.  It's

11     N-i-e-d-z-w-e-c-k-i.

12                   THE COURT:  All right.

13                   MR. MCGEE:  May I proceed, Your Honor?

14                   THE COURT:  You may.

15              JUSTIN NIEDZWECKI, GOVERNMENT'S WITNESS, SWORN

16                         DIRECT EXAMINATION

17     BY MR. MCGEE:

18     Q.    Agent Niedzwecki, you've heard, you've been here, and you

19     understand the defense objection and their argument that there

20     was serious coercion and blackmail or duress.  I think it's

21     really coercion and duress, right?

22     A.    Yes.

23     Q.    Okay.  You've interviewed multiple people?

24     A.    Yes.

25     Q.    Interacted with them?

1  A.    Yes.

2          THE COURT:  All right.  Mr. McGee, let's get this

3  witness's background and --

4          MR. MCGEE:  Yes, Your Honor.  I apologize.

5  BY MR. MCGEE:

6  Q.    Agent Niedzwecki, with whom are you employed?

7  A.    The Federal Bureau of Investigation.

8  Q.    And how long have you been a special agent?

9  A.    Over 10 years.

10 Q.    And you've been involved in the investigation of this

11 case?

12 A.    Yes.

13 Q.    Okay.  And you've conducted multiple interviews of

14 individuals that were with Ms. Cook and Mr. Carlstrom between

15 August 2019 until May 2020, correct?

16 A.    Yes.  Approximately.

17 Q.    And, without going into each interview separately, what

18 was -- what did everybody say that they acted like?

19 A.    They were a very loving couple.  You know, they -- lovey,

20 dovey, having sex all the time.  You know, basically, through

21 my investigation, it -- we started off interviewing -- you

22 know, James Sartorelli got -- was murdered on May 5th, 2020,

23 right?

24      So what we did was I interviewed people that Xaveriana

25 Cook and Hunter Carlstrom stayed with that 3 or 4 months prior

NIEDZWECKI - DIRECT

1  to the murder/robbery of James Sartorelli.  And, then, you

2  know, once they traveled here to Mississippi, they, you know --

3  well, they went to Memphis, stayed in a hotel.  Brought a dog

4  back to one of her -- the people that I interviewed.

5       And then they came -- went to Vardaman, Mississippi and

6  stayed with two individuals.  And, obviously, same thing, they

7  stayed there from the 7th of May to the 15th, which is the day

8  that Bob Dickerson was -- was shot by Hunter Carlstrom.

9  Q.   So you said -- you said -- the seven days, that was in

10 Mississippi with who?

11 A.   Hunter -- I mean, Spencer and Jaime Williams is who they

12 stayed with.

13 Q.   Okay.  And did they know anything about him being wanted?

14 A.   No, they did not.

15 Q.   And they didn't know what he just did, right?

16 A.   No, they did not.

17 Q.   Okay.  And, you know, we've talked about the bag.  But you

18 interviewed them.  And what did they say about the black bag?

19 A.   Well, the wife didn't know about it.  It was Spencer that,

20 you know -- I guess they went to a gas station.  The wife of

21 Spencer goes into the gas station to get something.  And

22 Spencer sees the gun.  Confronts Hunter about it.

23      Hunter says, no, that's not my gun; that's Xaveriana

24 Cook's.  And then she doesn't say anything.  And, basically,

25 Spencer's like, I'm not getting in trouble.  I know you're a

NIEDZWECKI - DIRECT

1    felon.  We're not doing this.  And, so, Hunter and his wife

2    apologizes; and we move on to the next thing.

3    Q.    Okay.  So you mentioned that they took a dog back to

4    Arkansas?

5    A.    That's correct.

6    Q.    And whose dog was that?

7    A.    That was Andrew Capps' dog.  So Andrew Capps is -- so,

8    after James Sartorelli is murdered, we've heard Ms. Cook talk

9    about how Hunter Carlstrom goes back, picks her up; and then

10   they go to Andrew Capps' house.  Right?

11         And they tell Andrew Capps to burn down -- Hunter tells

12   Andrew Capps to burn down James Sartorelli's residence.  And,

13   so, Andrew leaves at some point.  And Xaveriana Cook and Hunter

14   Carlstrom take, I think, Patches -- Patches was the dog's name.

15   They take him to Memphis.  And then they bring him back on

16   the -- you know, on the -- around the 7th.

17   Q.    What happened when they brought him back?

18   A.    There's a conversation.  So you have -- Xaveriana Cook has

19   a written statement where she basically says that, you know,

20   they brought the dog back.  Okay?  And they're talking about

21   Andrew Capps' dog.  Okay?

22         When they get to Andrew Capps' house, Andrews Capps and

23   Bill Carlstrom -- Bill Carlstrom is Hunter Carlstrom's

24   father -- comes out of the house.  There's words that are said.

25   And then, basically, Bill Carlstrom asks Xaveriana Cook to

NIEDZWECKI - DIRECT

1  stay.  And she's basically, no, she's going with her man.  You

2  know, she loves him.  And, so, he tried to get her to stay.

3      Obviously, they give the dog back.  Andrew Capps is inside

4  his residence, and he's listening to this.  And, so, you have

5  two individuals, Bill Carlstrom and Andrew Capps, that

6  basically heard that conversation.

7  Q.  You interviewed both of them, and that's what they said?

8  A.  Yeah.  I interviewed them separately.

9  Q.  Okay.  And you interviewed her as well, correct?

10  A.  I did.

11  Q.  And did she tell you that she was traveling willing?

12  A.  Yes, she did.

13  Q.  Okay.  Did you see any remorse when you were interviewing

14  her?

15  A.  No.  No, I didn't.

16  Q.  Okay.  And then --

17  A.  I'll just tell you this, I've been an FBI agent for

18  10 years.  Okay?  I've done a lot of interviews.  And, you

19  know, the purpose of that interview is to assess the situation,

20  to figure out what was going on.

21      That was a chaotic day.  Bob Dickerson had got shot.

22  Obviously, there's a lot of things going on.  And we're trying

23  to get down to the bottom of it.  But, yeah, I didn't see any

24  remorse.

25  Q.  Okay.  We talked a little bit -- I'm not going to play the

NIEDZWECKI - DIRECT

1  videos.  But the TikTok videos, those were in her phone?

2  A.    Correct.

3  Q.    And then, also, the TikTok records show those videos,

4  correct?

5  A.    That's correct.

6  Q.    On her account?

7  A.    That's correct.

8  Q.    So, lastly, there's this talk about the engagement ring,

9  about Hunter going to Van Atkins?

10  A.    Okay.

11  Q.    What did the surveillance tape show happened in that

12  situation?

13  A.    So we went to Van Atkins to pick up -- to see what kind of

14  footage we could get.  So we have about -- approximately

15  15 minutes of footage with Hunter Carlstrom in Van Atkins.  I

16  believe, in Xaveriana Cook's written statement, she -- she

17  points out that the -- you know, on the 14th of May, that they

18  had traveled to get the ring resized.  So you also have OPD --

19  surveillance footage of Xaveriana Cook's vehicle going around

20  the square, so --

21  Q.    And, just to be clear, was anybody with Hunter Carlstrom

22  when he went into Van Atkins?

23  A.    No.  He was by himself.  And he went to get this --

24  Xaveriana Cook's ring -- engagement ring is what it was

25  described as -- you know, resized.

NIEDZWECKI - CROSS

1  Q.    Did Spencer Williams or Jaime Williams -- did any of them

2  say anything about the ring?

3  A.    Yeah.  Jaime -- Jaime Williams, who is the wife of Spencer

4  Williams, noticed that Hunter Carlstrom and Xaveriana Cook at

5  some point had been wearing rings on their left hand, on their,

6  you know, wedding hand.  But she did not ask them if they'd

7  been married.  But she said that stood out.

8  Q.    Now, you have been the agent on this case, correct?

9  A.    That's correct.

10 Q.    And you've interviewed multiple people, right?

11 A.    Yes.

12 Q.    And her?

13 A.    That's right.

14 Q.    Have you seen any evidence of any serious coercion or

15 duress?

16 A.    No.

17       MR. MCGEE:  Tender the witness, Your Honor.

18       THE COURT:  Cross-examination.

19       MR. PARK:  May I proceed, Your Honor?

20       THE COURT:  Yes, sir.

21                    CROSS-EXAMINATION

22 BY MR. PARK:

23 Q.    Agent, on the day when you say that she was not showing

24 you any remorse, what had she been through that day?

25 A.    Say that again, please.

1  Q.    What had she been through that day?

2  A.    Well, Hunter Carlstrom had lost his life; and it was

3  obviously -- you know, Bob Dickerson had been shot.  It was --

4  you know, it was a chaotic day.

5  Q.    Approximately 82 shots were fired by law enforcement into

6  Ms. Cook's vehicle, correct?

7  A.    Correct.

8  Q.    And she was present for all of that, correct?

9  A.    Correct.

10  Q.    The father of her unborn child had been killed in front of

11  her?

12  A.    Correct.

13  Q.    You say she was not showing any remorse.  Was she in

14  shock?

15  A.    I don't believe that she was in shock.

16  Q.    Do you know how to diagnose shock?

17  A.    I'm not an expert on that.  All I can tell you is I've

18  interviewed a lot of people and -- as an FBI agent.  You know,

19  I've talked to her.  I didn't believe she was in shock.  And,

20  you know, she said what she had to say and that's --

21  Q.    How does a person act when they're in shock?

22  A.    Well, my experience with shock is that, obviously, you

23  know, they're not able to talk; they're not able to think

24  right.

25  Q.    And that's the day that you interviewed her, right?

NIEDZWECKI - CROSS

1  A.     I did interview her that day, yes.

2  Q.     Do you have any medical training?

3  A.     I mean, I'm not a medic.  I'm an FBI agent.  I mean, I

4  have -- you know, I had training when I was in the military.

5  But, as far as certificates or stuff like that, no, I don't.

6  Q.     Do you think that you have the qualifications to make the

7  determination as to whether or not she was suffering from

8  duress or coercion?

9  A.     I feel like -- that day when I interviewed her, I felt

10  like it was a good interview, you know, as far as her -- I

11  didn't see any signs of shock when I was talking to her.

12  Q.     Okay.

13  A.     She was very -- you know, she answered all the questions.

14  She was -- she was there.

15  Q.     Okay.  Have you ever talked to her before?

16  A.     I talked to her that day.  No.  Not -- I have not.

17  Q.     Have you ever --

18  A.     I listened to her in the courtroom when she's been

19  testifying.

20  Q.     Okay.  But, now -- so you did one interview with her,

21  right?  You had no other experience with Ms. Cook?

22  A.     No, I don't.

23  Q.     Okay.  And the bruises that we've seen in all of the

24  photographs that she attributes to Hunter Carlstrom, do you

25  have any reason to dispute that?

1  A.    That -- that you showed earlier?

2  Q.    Yes.

3  A.    I mean, I don't -- that's the first -- you know, I saw it

4  the other day when I went and talked to the U.S. Attorney's

5  Office.  But, I mean, I didn't see it -- those pictures weren't

6  on her phone that I dumped.  Like -- so I -- I don't know where

7  those are coming from.

8  Q.    Okay.  Well, you've heard her testimony that it was from

9  the hands of Hunter Carlstrom.  And you have no information to

10  dispute that, correct?

11  A.    I do not.

12  Q.    Okay.  And I noticed some things happened in your

13  interview with Ms. Cook.  Did you ask her anything about abuse

14  by Hunter Carlstrom toward her?

15  A.    No, I didn't.

16  Q.    Did you ask her about abuse in her life prior to meeting

17  Hunter Carlstrom?

18  A.    No, I didn't.

19  Q.    You didn't go into any of those issues at all?

20  A.    No, I did not.

21  Q.    Okay.  And you heard her dispute the fact that the word

22  *willingly* was the word that she came up with.  She said that it

23  was the word that was discussed by the agents.

24  A.    Yes.  That was a question I asked.

25  Q.    Okay.

NIEDZWECKI - CROSS

1  A.     And the reason I asked that is because, obviously, we're

2  trying to figure out -- assess the situation and figure out

3  what's going on.  And, you know, to me, that's the normal

4  question to be asked, is were you willingly there, you know.

5  And the answer is either yes or no.  And the answer was, yes,

6  she was.

7       And I think that at a point -- that was her opportunity to

8  say that; you know, to say that she was a victim, you know,

9  that she's -- was a victim of Hunter Carlstrom.  That's not

10  what she said.  What she said was that, yes, she was there

11  willingly.

12  Q.     You said it was her opportunity to say that?

13  A.     She told the truth.  I feel like she told the truth to me.

14  Q.     But, in terms of the abuse aspect that we're talking

15  about, the PTSD --

16  A.     I'm not an expert on that.  I'm not an expert on that.

17  All I was trying to do was gather facts and get the facts to

18  figure out what was going on.

19  Q.     Okay.  So she's been diagnosed with PTSD.  We've talked

20  about what happened that day, and you're telling the Court that

21  in terms of the interview she was unremors -- she had no

22  remorse, correct?

23  A.     Yeah.  That's my -- that's what I felt, absolutely.

24  Q.     Did you ask her?

25  A.     And I've been doing interviews for 10 years.  But, yeah,

NIEDZWECKI - CROSS

1    that's the way I felt.

2    Q.    Okay.  Did you ask her?

3    A.    Did I ask her what?

4    Q.    Did you ask her anything about the PTSD, about --

5    A.    I didn't.  How am I supposed to know she had PTSD that

6    day?

7    Q.    Okay.  Did you ask her anything about her medical

8    condition?

9    A.    No.  I -- I don't recall if I did or not.

10   Q.    Okay.

11   A.    If it's not in my 302, I guess I didn't.

12   Q.    And you said it was her opportunity to speak about the

13   abuse; but you never asked her about the abuse, right?

14   A.    How was I suppose to know about that, I guess, is what I'm

15   getting at.

16   Q.    Well, that's my point, is that there are a lot of things

17   that you didn't ask her in the interview.

18   A.    I -- that's right.  I guess that's your -- that's your

19   point of view, I guess.

20   Q.    And you're saying that you've -- that you were involved in

21   interviews with some of these other people, and you've

22   mentioned Andy Capps in particular and him overhearing a

23   conversation.  Now, Andy Capps also admitted that he was

24   extremely scared of Hunter Carlstrom, correct?

25   A.    Yeah, I think so.

NIEDZWECKI - CROSS

1  Q.    And, with Bill Carlstrom, the father, there were numerous

2  times in what was provided to me in discovery where he was not

3  being truthful with agents.  They'd have to go back in and

4  point out his inconsistencies to him, correct?

5  A.    That was prior to my involvement, but yes.

6  Q.    Okay.

7  A.    And, when I spoke to Bill Carlstrom and when I talked to

8  Andrew Capps, I believe that they were honest with me about

9  everything.  I didn't -- you know, I didn't catch any lies.

10  Q.    Okay.  So other officers found lies, but you didn't?

11  A.    That was when all the -- when everybody was hunting for --

12  not hunting but tracking down Hunter Carlstrom and trying to

13  figure out what was going on.  That was their investigation by

14  the State in Arkansas.  Yeah.  Those interviews were prior to

15  my involvement in the case.  But, yes, those interviews.

16  Q.    But they show, and those officers pointed out, that Bill

17  Carlstrom is not a very honest man?

18  A.    Right.  And I'm sure Hunter Carlstrom isn't.  And I'm sure

19  Andrew Capps isn't.  They all have criminal histories.  But,

20  when I sat down and talked to them, I believe that they were

21  telling me the truth.

22  Q.    And you heard Ms. Cook testify earlier that the comment

23  from Bill Carlstrom saying that she could stay with him never

24  heard?

25  A.    Well, that's what she said.  That's right.  But my whole

1 point is that Andrew Capps, who was another individual that was

2 witness to that, her coming back -- I understand she says

3 that's not what happened.  But, you know, through interviews

4 with other people, they're saying it did happen, two other

5 individuals.

6 Q.    Andy Capps.  Who is a meth head, right?

7 A.    Yeah.  I mean, I guess that's -- he has a drug problem.

8 And, you know, from my interviews with Spencer Williams, Jaime

9 Williams, Ms. Cook was using marijuana every day.  And Andrew

10 Capps and, I think, Bill Carlstrom and Andrew Capps' mother, I

11 want to say -- I think that she had -- she was using -- she was

12 known to be using marijuana while she was pregnant during the

13 time period that I interviewed folks, you know, from the time

14 that she'd spent --

15          THE COURT:  All right.  Gentlemen, we're getting out

16 into the weeds.  I don't even -- it's hard to follow all these

17 people that you keep bringing up.  So let's move on to the

18 relevance of your cross-examination.

19          MR. PARK:  Okay.

20 BY MR. PARK:

21 Q.    And, also, with the Williams, you mentioned that Ms. Cook

22 and Mr. Carlstrom were wearing rings, like wedding bands,

23 right?

24 A.    That's what Jaime Williams said.  That's correct.

25 Q.    When Ms. Cook was arrested, did she have any rings on?

1  A.    No.  Because they were headed to pick up those rings.

2  Because they had had them resized on the 14th on the square.

3  Q.    So, in other words, the ring would not fit; so she had to

4  take it back to get it sized, right?

5  A.    Right.

6          MR. PARK:  That's all I have, Your Honor.

7          THE COURT:  Thank you.

8       You may step down.

9       Does that wrap your case up, Mr. McGee?

10         MR. MCGEE:  Your Honor, other than my understanding

11 is the victim, James Sartorelli's, daughter would like to read

12 her statement into the record.  Her name is Sabrina

13 Blankenship, and I believe she's on the Zoom call.

14         MS. BLANKENSHIP:  I am, yes.

15         THE COURT:  Ten minutes, max.

16         MS. BLANKENSHIP:  That's fine.  I can do this in ten

17 minutes.  All right.  So I am James' daughter.  And I just

18 wanted to kind of read my statement real quick for you guys.

19 Give me just a second.

20         MR. MCGEE:  Ms. Blankenship, would you bring your

21 video on?  Turn it on, if you don't mind, Ms. Blankenship, so

22 we can see you.

23         MS. BLANKENSHIP:  All right.  Sorry about that.  So

24 the host disabled the video, so I can't get the video to work.

25 There we go.  Hold on.  I got it.  They just asked.

1           THE COURT: All right. Ten minutes max. Go ahead.

2           MS. BLANKENSHIP: Okay. I'm just going to sit down.

3 Excuse me. So I am James's daughter. Let's see if I can get

4 through this. So someone had mentioned trauma today, and I

5 just wanted to take a second and talk about what it's like

6 dealing with his death.

7      It's been, quite honestly, a nightmare. The pain comes

8 kind of when you least expect it, and it leaves you breathless.

9 I wonder about his last moments, the last thoughts that he had;

10 and that buries you in grief.

11      The choices that were made by this woman and her boyfriend

12 caused a man his life. Her silence to say something, anything,

13 when she knew what was going to happen caused my father the

14 right to be part of the world.

15      I am sorry for whatever happened to her. However, what

16 you choose to allow from the behavior of a man is on you. If

17 you would have had time to send photos and texts to friends and

18 family, then you had time to call someone, anybody. You had

19 time to text somebody. You had time to say something about the

20 murder of my father. All she had to do was say something to

21 somebody.

22      Knowing he is gone has been incredibly difficult. I am

23 now never going to have the opportunity to sit and talk with

24 him, to ask him questions, to look or to hug the man who I so

25 closely resemble. He did not deserve to lose his life at the

1    hands of you or your boyfriend.  I know that you were not there

2    during his death, but I know that you knew.  And, in my eyes,

3    that makes you just as guilty.  You did nothing.

4        My father deserved to be here to live his life, to be able

5    to come back at an age to visit his family.  You took someone

6    away that many people will miss.  Somebody who brightened a lot

7    of people's days, made people laugh, gave people someone to

8    listen to.  You took someone away who was loved by many.

9        Now I visit him where I laid him to rest.  I look at

10   pictures when I want to remember what his face looks like.  I'm

11   sorry.  I talk to him whenever I feel like I can't breathe.

12   The pain is crushing.  And I'm thankful that he's home with me.

13   But this isn't the way it should have been.

14       One man lost his life for befriending another, and one

15   lost his life due to his own poor choices.  And now all that's

16   left is for two people who cared about two separate people to

17   pay a price.  You could have saved everybody from all this

18   heartache.  All you had to do was just do something; and,

19   instead, you chose to do absolutely nothing.

20       Thank you, Your Honor.

21           THE COURT:  All right.  Thank you.

22       All right.  Cut it off.

23       All right.  That's the victim impact statement provided

24   for by statute, federal statue, for victims.  I'm not sure

25   Sartorelli was a victim of this defendant.

1      But, Mr. Park, anything to argue about that?  I'll be glad

2  to hear it.  Seems like a different case to me, but -- as

3  opposed to talking to this defendant in this case.

4           MS. BLANKENSHIP:  With all due respect, Your Honor,

5  all she had to --

6           THE COURT:  Cut her off.

7           MS. BLANKENSHIP:  -- do was say something.

8           THE COURT:  All right.

9           MS. BLANKENSHIP:  She never did.

10           THE COURT:  What was the relevance of her father

11  being killed to this defendant?

12           MR. MCGEE:  Your Honor, she pled guilty to

13  accessory -- Ms. Cook pled guilty to accessory after the fact

14  of the Hobbs Act Murder because they robbed a drug dealer of

15  his proceeds and drugs, of Mr. Sartorelli.  So it's one of the

16  counts.

17           THE COURT:  Okay.  What about the gun?

18           MR. MCGEE:  The same gun that killed him was the same

19  gun that --

20           THE COURT:  Okay.

21           MR. MCGEE:  -- she aided and abetted a felon in

22  possession of.

23           THE COURT:  Okay.  Good.  Thank you.

24      Do you agree with that, Mr. Park?

25           MR. PARK:  I do, Your Honor.

1      THE COURT:  Okay.

2      MR. MCGEE:  Your Honor, lastly -- this is the last

3 thing the Government has as far as witnesses.  Mr. Dickerson

4 will rest on his statement that's in the PSR on pages 8 and 9.

5 And he is here if the Court has any inquiries or further

6 questions about that statement.  Thank you, Your Honor.

7      THE COURT:  Okay.  No.  I've read Mr. Dickerson's

8 statement.  And I know what his situation is, very dire.  But,

9 if he doesn't want to -- if he just wants the statement to

10 stand, then that's his prerogative.  We'll keep it that way.

11   All right.  Court will be in recess.  We'll pass

12 sentence -- we'll end it today.  And Court will now be in

13 recess for 15 minutes.

14          (Recess at 4:26 p.m. until 4:42 p.m.)

15      THE COURT:  All right.  Since the plague is still

16 surging, Mr. Park, you may keep your client there at the table

17 if you wish.  No.  I'll have you to bring her out here, to this

18 table here.  That's far enough away from everybody that it'll

19 be okay.

20   (Parties complying)

21      THE COURT:  Ms. Cook, you, as you know, have entered

22 a plea of guilty previously to two counts involving the -- your

23 episodes with Hunter Carlstrom.  I've heard the testimony.

24 I've heard the objections and the evidence presented by both

25 the -- your counsel and the Government.

1          I will say that I think your counsel has presented a good

2    defense for you with what he had to work with.  And the Court's

3    taking that into consideration.  Your guidelines -- I'll first

4    ask you, is there anything else you wish to state before you're

5    sentenced?

6              THE DEFENDANT:  Yes, Your Honor.

7              THE COURT:  Pardon?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  All right.

10             THE DEFENDANT:  I would like to take full

11   responsibility for my actions and say that --

12             THE COURT:  I'm sorry.  You're going have to talk

13   more plainly.

14             THE DEFENDANT:  I said I want to take full

15   responsibility for my actions, and I -- I am sorry that

16   everything happened the way that it did.  And I wish I would

17   have -- would have been able to actually, like, get ahold of

18   myself and say something; and that -- that didn't happen.

19             THE COURT:  Okay.

20        Mr. Park?

21             MR. PARK:  Your Honor, I know the Court is aware that

22   Ms. Cook is quite nervous today; but she's also, in recent

23   conversations, wanted to express her remorse for Marshal

24   Dickerson, who was shot in the line of duty; also for the

25   Sartorelli family for their loss as well.

1        But, as Your Honor knows, Ms. Cook did not kill these

2    people.  She -- or Mr. Sartorelli and did not shoot Marshal

3    Dickerson.  She was, in essence, involved in a relationship

4    with a monster.  And you saw the photographs of the bruises and

5    the scrapes and the marks.

6        You've seen a copy of the felony charges that were pressed

7    against Hunter Carlstrom for assaulting Ms. Cook, both felony

8    and misdemeanor charges.  You've heard the testimony of other

9    people talking about how afraid they were of him.

10       And then you heard, also, the testimony of Dr. Paret.

11   He's diagnosed her with PTSD.  In fact, she was diagnosed with

12   that before he ever made the diagnosis.  She's got depression,

13   major depressive disorder, and, also, anxiety.  You know, the

14   question here -- and I think Dr. Paret tried to address it as

15   best he could -- is why didn't she just leave; why didn't she

16   just walk away.

17       You heard the young lady mention, well, why didn't you

18   make a call?  And Dr. Paret put it in terms of that learned

19   helplessness, the fact that she was overcome by her fear.  It's

20   not unusual for abused women to go back to their abusers.  And,

21   unfortunately, Ms. Cook did this.

22       You know, she left Illinois, went with him to Arkansas.

23   And, as she testified, when -- when Hunter said I'm going to go

24   kill James Sartorelli, she didn't believe him.  She thought he

25   was just saying things.

1       Then, when he comes back and says that I've done it, she

2  realized that he did commit that murder.  And it puts her in a

3  predicament of being together with an individual who just

4  committed a murder and certainly is not afraid to do it again.

5  Like I said, we know that there's a history of abuse.

6       And, at the same time, in, you know, virtually every --

7  every relationship there are good times and there are bad

8  times.  Her bad times were certainly bad.  But, you know, there

9  were good times when they were getting along when they were a

10  couple.  She was pregnant with his child.

11       But, Your Honor, we're submitting that there was serious

12  coercion; and that she was under duress at the time because of

13  the abuse from Hunter Carlstrom.  And the fact that she had

14  PTSD, she was not able to break herself away from it.

15       We were submitting -- and we have through our sentencing

16  memorandum -- asking the Court to consider a departure or a

17  variance based upon that.  And the guideline itself says

18  that -- you know, that those things may not amount to a

19  complete defense; but it -- it says, ordinarily, coercion will

20  be sufficiently serious to warrant departure only when it

21  involves the threat of physical injury.

22       With Ms. Cook, it went beyond that.  He actually did

23  injure her.  He threatened to keep punching her in the stomach

24  until she lost the child.  He threatened to cut the child out

25  of her belly.  She knew that -- you know, that he was a --

 1    someone that had to be feared.  He threatened her family, her

 2    grandmother and grandfather.  He threatened her child from

 3    another union and also the father of that child.

 4         But every direction that she turned, she felt fear.  She

 5    felt that there were going to be repercussions if she left him,

 6    repercussions to her and to her family.  And, so, we're asking

 7    the Court to take all of that into consideration.

 8         We'd also ask the Court to consider her role in the

 9    offense.  You know, she was not involved in planning any

10    murders or anything else along those lines.  Her main

11    involvement was just driving him in her car from Arkansas down

12    to Mississippi.  But we would submit that the level of

13    participation is lowered as well.

14         And, finally, we would ask the Court to consider her

15    diminished capacity at the time based upon her depression,

16    anxiety, the emotional state that she was in.  Your Honor's

17    familiar with Dr. Paret's report.  He went into a lot of those

18    details.  He did objective testing on her, found that she was

19    not exaggerating or malingering in any way.

20         So, Your Honor, we would submit that -- that looking at

21    this case in the totality -- you know, Hunter Carlstrom's dead.

22    And -- and, you know, it's hard to sit here and say that he

23    didn't deserve it.  The guy was a monster.  And Marshal

24    Dickerson didn't deserve to be shot.  And Ms. Cook also

25    realized at the same time had she really stood up to Hunter

1   Carlstrom she'd probably be dead too.

2         But, Your Honor, we're asking the Court to take all this

3   into account.  And we're asking the Court to consider a

4   significant variance from the guideline range.  And with

5   Ms. Cook's -- you know, she has no criminal history; and she

6   has no history of violence.  So, in terms of protecting the

7   public and the other factors under 18 USC 3553, I would think

8   that a much lower sentence than what the guidelines call for is

9   appropriate.

10        You know, as an accessory -- you pointed this out at the

11  change of plea.  As an accessory, she faces the same punishment

12  as the principal.  But there's such a -- a -- a degree of

13  disparity between the actions of Hunter Carlstrom and those of

14  Ms. Cook.

15        So, Your Honor, based on that, we ask for the lowest

16  sentence that the Court deems to be appropriate.  We'd also ask

17  that the Court consider allowing her to voluntarily report if

18  the Court imposes a sentence of imprisonment.  And -- and,

19  given that she's due to have a baby in -- on March the 4th, we

20  would ask the Court to consider that as well in determining if

21  she voluntarily reports and where.

22              THE COURT:  All right.  Thank you.

23        Mr. McGee?

24              MR. MCGEE:  Your Honor, I'm not going to belabor too

25  much.  The Court has heard -- I'm sorry.

1    THE COURT:  What are you asking for?

2    MR. MCGEE:  Your Honor, we are asking for a

3  substantial sentence.  I think the diminished capacity, duress

4  argument was disproved today in front of the Court.  She just

5  said she takes full responsibility for her conduct.  She said I

6  wish I wouldn't have done what I did.  Because she's taken --

7  that's what she did.  She was not under duress.  It was her

8  decision to be with him; and the evidence shows that, Your

9  Honor, we presented.

10    The pictures and whatnot -- the TikTok videos, she says

11  she didn't make the TikTok videos.  Your Honor, I personally

12  heard a jail call on May 24th, 2020 where she had --

13    THE COURT:  A jail call?

14    MR. MCGEE:  A jail call where she admitted to making

15  the Tik --

16    THE COURT:  Tell me what you mean by that.

17    MR. MCGEE:  I'm sorry, Your Honor.  A jail call

18  recorded between her and her grandmother while she was

19  incarcerated.  She admitted to making the TikTok videos.  And

20  then she got up on the stand today and said that she didn't

21  make them.  Multiple times she told the truth today.

22    THE COURT:  She said she made some of them.

23    MR. MCGEE:  She said she took the pictures, Your

24  Honor; but she said she did not make the TikTok videos.  That

25  video of the slideshow, she said she didn't --

1          THE COURT:  All right.

2          MR. MCGEE:  Anyway, again, I won't belabor the Court.

3   We just -- we feel that this is a case that involves multiple

4   crimes, a murder in Arkansas, continuing crime throughout,

5   accessory after the fact.

6          Mr. Park says that she's essentially being held as the

7   same as the principal.  That's not true.  Accessory after the

8   fact takes that into account in the guidelines.  She had a 30

9   instead of a 43.  So it takes that into account.

10         And then we have the crime of possessing the firearm that

11  shot James Sartorelli and Bob Dickerson.  So, Your Honor, the

12  Government submits that we -- we respectfully request a

13  substantial sentence for Ms. Cook.

14         THE COURT:  Okay.  Thank you.

15         The Court finds that in this case the sentencing

16  guidelines are -- have been computed and are set forth in

17  Paragraphs 93 and 94 of the Presentence Report.  The maximum

18  term of imprisonment on this particular charge is 10 years on

19  each of the charges for a total of 20.  They can be levied

20  individually or combined.

21         The guideline provisions -- based on an offense level of

22  42 and a criminal history category of I, which is what this

23  defendant has, the guideline range of imprisonment is

24  120 months on each count.

25         The fine range under the guidelines is 50,000 to 250,000.

1    I will say at this point I think a sentence involving a fine

2    would be an excise in futility.  This defendant is not capable

3    of paying a fine.  So, therefore, there will be no fine levied.

4         The mandatory -- Ms. Cook, you're going to be put on

5    supervised release after your prison sentence.  And the

6    mandatory supervision requirements will be imposed and the

7    standards that are set out in the plea agreement and the

8    Presentence Report.  And they will be applicable.

9         There are several special conditions of supervision that

10   the Court's going to impose.  And that must be done

11   individually and especially outside of the special and

12   mandatory supervision requirements.  I'm going to ask Probation

13   Officer Marlier if he will read the special conditions that you

14   must abide by after you're released from prison.

15              MR. MARLIER:  The defendant shall comply with the

16   following mandatory condition:  She must cooperate in the

17   collection of DNA as directed by the probation officer.  The

18   defendant shall comply with the standard conditions that have

19   been adopted by this Court.

20        In addition, taking into consideration any prior court

21   ruling on objections, if any, to the special conditions of

22   supervision as outlined in the Presentence Report, and

23   considering there is no additional opposition, the Court

24   imposes the following special conditions:  Number 1, the

25   defendant shall participate in a program of testing and

1   treatment for substance abuse, details of which will be

2   outlined and supervised by the probation officer until such

3   time as the defendant successfully completes the program or is

4   deemed by the treatment provider to no longer be in need of

5   treatment.

6       Number 2, the defendant shall participate in a program of

7   mental health treatment, details of which will be outlined and

8   supervised by the probation officer until such time as the

9   defendant successfully completes the program or is deemed by

10   the treatment provider to no longer be in need of treatment.

11       Number 3, the defendant shall submit her person, property,

12   house, residence, vehicle, papers, computers, other electronic

13   communications, or data storage devices or media or office to a

14   search conducted by the United States Probation Officer.

15       Failure to submit to a search may be grounds for

16   revocation of release.  The defendant shall warn any other

17   occupants that the premises may be subject to searches pursuant

18   to this condition.  An officer may conduct a search pursuant to

19   this condition only when reasonable suspicion exists that the

20   defendant has violated a condition of her supervision.  Any

21   search must be conducted at a reasonable time and in a

22   reasonable manner.

23       And, finally, the defendant shall enroll in a program to

24   prepare for the test of General Education Development, details

25   of which will be monitored by the probation officer.

1           THE COURT:  All right.  Thank you.

2       There are three objections made by the defendant to the

3  Presentence Report.  I'll deal with all three at this time.

4  There was an objection made to the Court considering these

5  statements in the Presentence Report of Bill Carlstrom.

6       The Court has looked at those statements.  Some of them

7  are very damning; some of them are not.  It does not appear to

8  the Court that -- that these statements from Carlstrom, even if

9  considered, have a significant affect on the sentence.

10      But the Court does call to the attention of the record

11  that in the case of *U.S. v. Glen Peterson* the Court can and

12  should take note or consideration of any evidence or statements

13  in the Presentence Report that have any indicia of reliability.

14  The Court said that the district -- this is the Fifth Circuit

15  court -- case.

16      It says the district courts' reliance on presentence

17  investigative reports, the PSR, is based on a finding of fact

18  that the PSR's information contains indicia of reliability.

19  When making factual findings for sentencing purposes, district

20  courts may consider any information which bears sufficient

21  indicia of reliability to support its probable accuracy.

22      Now, as far as to Bill Carlstrom, regardless how bad a guy

23  he might have been, there were some indicia of credibility in

24  these statements, the Court finds, when he told Ms. Cook that

25  she did not have to go with Carlstrom, with Hunter Carlstrom,

1  the son; and she could stay with him.  It may have been true

2  and may not have been.  But, at any rate, there's been no

3  contradiction of what he said by any witness.  So that

4  objection is overruled.

5       Objection No. 2 was resolved between counsel, and the

6  Court will not go over those.  There's an Objection No. 3

7  asking for -- consider Ms. Cook's role in a mitigating theme.

8  The Court overrules that objection.  It is of the opinion that

9  there is sufficient evidence that she was active and willingly

10  going through these actions to not have to put her in a

11  mitigating role.

12       Based on these conversations, it's the sentence of the

13  Court -- and pursuant to the Sentencing Reform Act of 1984 --

14  that the defendant, Xaveriana Cook, is hereby committed to the

15  custody of the Bureau of Prisons to be imprisoned for a term of

16  84 months on Counts 1 and Count 4.  These counts to be served

17  concurrently.

18       Now, while you're on -- serving this sentence, Ms. Cook,

19  there are several good things that can happen to you.  Your

20  witness, the psychologist, testified today you need counseling;

21  and you need help on certain mental aspects of your life.  You

22  can get this counseling in prison.  Federal prisons have very

23  good counseling availability for people who want to participate

24  in it.  And I hope you do because you will be able to profit

25  from it.

```
 1          I have -- you made a motion to allow you to remain out on
 2   bond pending the execution of the sentence.  That's -- that
 3   is -- may be one of the more gray questions -- or answers that
 4   we have in this case, I think, because you have no criminal
 5   record.  But, when you were up before the Court -- you have no
 6   criminal record; and, in addition to that, I doubt if you have
 7   a way to run.
 8          But the thing that mitigates against your being allowed to
 9   remain under bond is that about a year ago you came up before
10   the Court when you were first charged with this crime -- these
11   crimes, and you were eight months pregnant.
12          And you argued that you should not be kept in custody; you
13   should be allowed to have bond, to have house arrest, and have
14   the baby delivered, and then come back before the Court to be
15   sentenced.  The Court granted that request.
16          Now, over a year later, we have you come back before the
17   Court for sentencing; you're eight months pregnant again.  And
18   I -- it just feels like that you're playing games with the
19   Court.  And maybe it worked before, but it -- and maybe it'll
20   work this time.
21          But the Court believes that with your -- you're not taking
22   your role -- the Court's role seriously in carrying out these
23   sentences.  And it will be the order of the Court that you're
24   taken into custody now, and you'll be transported to a federal
25   facility that is available and specializes in the delivery of
```

1  children by pregnant prisoners.  And I hope you can -- it may

2  be the best thing that -- I hope you can profit from it.

3        Now, you have the right to appeal any sentence that's

4  imposed illegally or is a result of any miscalculation of the

5  guidelines.  And, if you do not have the funds to pay for that

6  appeal, the Court will order someone to help you do that.

7        Anything else?

8            MR. MCGEE:  Two things, Your Honor.  I may have

9  missed it, but what did you state the supervised release years

10  were?

11           THE COURT:  Three years.

12           MR. MCGEE:  Three years.  Thank you, Your Honor.  And

13  then lastly, Your Honor, the Government would move to dismiss

14  Counts 2, 3, and 5.

15           THE COURT:  It'll be so ordered.

16           MR. PARK:  Your Honor, I know Ms. Cook is

17  appreciative that the Court has done a downward variance in

18  regard to her guideline range.  However, if she were to choose

19  to pursue an appeal, we would respectfully object to the

20  reasonableness of the sentence, just to preserve the discretion

21  used on appeal.

22           THE COURT:  All right.  You may do so.  That's

23  certainly within your right.

24           MR. PARK:  Thank you, Your Honor.

25           THE COURT:  All right.  The defendant's in the

1    custody of the marshals.   The Court will be in recess.

2                    (Proceedings concluded at 5:04 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2

 3

 4              I, Rita Davis, Federal Official Realtime Court

 5   Reporter, in and for the United States District Court for the

 6   Northern District of Mississippi, do hereby certify that

 7   pursuant to Section 753, Title 28, United States Code that the

 8   foregoing is a true and correct transcript of the

 9   stenographically reported proceedings held in the

10   above-entitled matter; and that the transcript page format is

11   in conformance with the regulations of the Judicial Conference

12   of the United States.

13

14

15              Dated this 16th day of March, 2022.

16

17

18

19              /s/ Rita Davis _____
                RITA DAVIS, FCRR, RPR, CSR #1626
20              Federal Official Court Reporter

21

22

23

24

25
```